No. 111,650


IN THE COURT OF APPEALS OF THE STATE OF KANSAS


In the Matter of the Equalization Appeal of
KANSAS STAR CASINO, L.L.C.
for the Year 2012 in Sumner County, Kansas.


SYLLABUS BY THE COURT


1.

This court reviews a decision from the Court of Tax Appeals in the manner prescribed by the Kansas Judicial Review Act, K.S.A. 77-601 *et seq*.


2.

In reviewing the evidence in light of the record as a whole, this court does not reweigh the evidence or engage in de novo review. The term "in light of the record as a whole" is statutorily defined to include the evidence both supporting and detracting from an agency's finding. K.S.A. 2014 Supp. 77-621(d). Thus, this court must determine whether the evidence supporting the agency's factual findings is substantial when considered in light of all the evidence.


3.

The burden of proving the invalidity of agency action is on the party asserting invalidity.


4.

The central tenet of the cost approach is the principle of substitution: an informed buyer will pay no more for a property than the cost to acquire a similar site and construct improvements of like desirability and utility. An appraiser is to estimate market value

1

under the cost approach by (1) estimating the value of the land, (2) estimating the replacement cost of the improvements, (3) subtracting depreciation as necessary, and (4) adding the land and improvement values together.

5.

Under Kansas law, real property is appraised at its fair market value. For the purposes of ad valorem taxation, the fair market value of a property is based on the property's highest and best use. The highest-and-best-use analysis is performed assuming the subject property is vacant. Four criteria are used to evaluate a property's highest and best use: (1) physical possibility; (2) legal permissibility; (3) financial feasibility; and (4) maximum productivity.

6.

Economic conditions, such as unforeseen or heavy expenses affecting a property owner, do not cause such owner's ad valorem taxation to change because such circumstances do not affect the value of the owner's real property. Conversely, an economic factor that actually changes the value of an owner's real property properly alters the owner's ad valorem taxation rate.

7.

Kansas law requires the fee simple interest in a property be valued for the purposes of ad valorem taxation. A fee simple interest is absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

8.

In Kansas, fair market value means the amount of money that a well-informed buyer is justified in paying and a well-informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without

2

undue compulsion. Kansas has not statutorily defined "compulsion," so instead a court should rely on the term's plain meaning.

9.

The Court of Tax Appeals may not rely on an approach to value that is expressly prohibited by the Uniform Standards of Professional Appraisal Practice. However, Uniform Standards of Professional Appraisal Practice violations that are not materially detrimental to an appraiser's overall opinion of value are not fatal to a county's case.

10.

The determination of whether property is real or personal must be made on a case by case basis. The test for determining whether personal property becomes a fixture is: (1) annexation to the realty; (2) adaptation to the use of that part of the realty with which it is attached; and (3) the intention of the party making the annexation. The county bears the burden of proving the appropriate classification of a commercial sign as either personal or real property.

11.

In the context of real estate appraisal, "soft costs" or indirect costs are expenditures or allowances for items other than labor and materials that are necessary for construction but are not typically part of the construction contract.

Appeal from the Court of Tax Appeals. Opinion filed November 20, 2015. Affirmed.

*Lynn D. Preheim* and *Jarrod C. Kieffer*, of Stinson Leonard Street LLP, of Wichita, for appellant.

*David R. Cooper* and *Andrew D. Holder*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, for appellee.

Before MALONE, C.J., GREEN and POWELL, JJ.

POWELL, J.:  Kansas Star Casino, L.L.C. (Kansas Star) appeals from the ruling by the Kansas Court of Tax Appeals (COTA) that the appraised value of its property, a 195.5 acre tract of land located in the northeast corner of Sumner County and used for casino operations, was $80,510,000 for the tax year 2012. In reaching its conclusion, COTA determined that the value for Kansas Star's land was $16,931,250. This amount was based on the actual price Kansas Star's parent company paid for the land. On appeal, Kansas Star argues that COTA erroneously inflated the value of its land and that the land should have been valued based on sales of agricultural property in the surrounding area. The County cross-appeals, arguing COTA erred in declining to include various additional costs as part of its valuation. After a careful review of the record, we agree with COTA's ruling in all respects and therefore affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *An Overview of the Kansas Expanded Lottery Act and the Single Management Contract*

The Kansas Legislature enacted the Kansas Expanded Lottery Act (KELA), K.S.A. 74-8733 *et seq*., in 2007. KELA divided the state into four gaming zones: northeast, south central, southwest, and southeast, each of which would be allowed to have only a single gaming facility management contract. K.S.A. 2014 Supp. 74-8734(a), (d). Sedgwick County and Sumner County comprise the south central gaming zone. K.S.A. 2014 Supp. 74-8702(f).

KELA established a process under which the State owns the casino's gaming operations but hires a gaming facility manager via a management contract to construct and own the casino improvements and infrastructure as well as to manage the gaming operations. Specifically, KELA provides that the management contract shall "allow the

4

lottery gaming facility manager to manage the lottery gaming facility in a manner consistent with this act and applicable law, but shall place full, complete and ultimate ownership and operational control of the gaming operation of the lottery gaming facility with the Kansas lottery." K.S.A. 2014 Supp. 74-8734(h)(17). Further, "[a] lottery gaming facility manager, on behalf of the state, shall purchase or lease for the Kansas lottery all lottery facility games. All lottery facility games shall be subject to the ultimate control of the Kansas lottery in accordance with this act." K.S.A. 2014 Supp. 74-8734(n)(2). KELA also created a Lottery Gaming Facility Review Board (Review Board) that was charged with evaluating lottery gaming facility management contracts. K.S.A. 2014 Supp. 74-8735(a), (h).

Potential gaming facility managers' casino proposals had minimum infrastructure requirements, including a $225 million minimum investment amount for the south central gaming zone. K.S.A. 2014 Supp. 74-8734(g)(2). Management contracts were to be for an initial maximum term of 15 years, and the winner of the management contract in the south central gaming zone was required to pay a privilege fee of $25 million in order to be selected as the lottery gaming facility manager for that zone. K.S.A. 2014 Supp. 74-8734(h)(1), (6). KELA mandated that the approved management contract contain provisions for payment of 22% of gaming revenues to the State, 2% to the problem gambling and addictions grant fund, 2% to the county in which the casino was located, and 1% to the other county in the zone. K.S.A. 74-8734(h)(12), (13), (16). KELA also specified that the "management contract shall not constitute property, nor shall it be subject to attachment, garnishment or execution, nor shall it be alienable or transferable, except upon approval of the executive director, nor shall it be subject to being encumbered or hypothecated." K.S.A. 2014 Supp. 74-8734(m).

Under KELA, once a management contract is approved by the Review Board, the contract has to be submitted to the Kansas Racing and Gaming Commission (KRGC) for

5

a background check and final approval. K.S.A. 2014 Supp. 74-8736(e). Facility managers and their employees must also be licensed and certified. K.S.A. 2014 Supp. 74-8751.

B.     *Selection of the South Central Zone Gaming Facility Manager*

The selection of the south central zone gaming facility manager was a lengthy process that encompassed three rounds of proposals. Potential gaming facility manager proposals included a proposed site for the casino. However, none of the proposed casino sites were purchased by the prospective applicants prior to the award of the management contract. Instead, various entities entered into option agreements to purchase the tracts at prices substantially above market value if, and only if, the site were part of the proposal selected for the management contract. All the proposed casino sites presented throughout the bidding process were agricultural-use properties. The entities that submitted proposals to the Kansas Lottery also applied for zoning at the proposed sites, and such zoning was granted to the proposed tracts.

The first round of bids occurred in 2008. The approved proposal's site for the casino was located on the combined Wyant and Brewer tracts in Sumner County. However, the first approved proposal was withdrawn due to the economic downturn during the 2008 recession.

Beginning in 2009, Scott Cooper, who served as an analyst for the Review Board, assisted in evaluating proposals during the second round of bidding. In the second round, the Kansas Lottery approved the bid of a gaming facility manager group with a prospective location immediately south of the Wyant and Brewer tracts—the Gerlach tract located in Sumner County. However, due to infighting within the management group, no management contract was awarded.

6

In 2010, Peninsula Gaming (Kansas Star's parent company) hired Cooper to develop and expand its gaming operations in the United States. Cooper helped Peninsula assemble a proposal for the third round of bidding. Peninsula submitted its bid alongside two other prospective gaming facility managers.

For its bid, Peninsula chose to acquire purchase options for two abutting tracts: the Wyant tract (selected for the management contract in round one) and the Gerlach tract (selected for the management contract in round two). The owners of the Gerlach tract initially entered into a purchase option agreement with Paul Treadwell and Mark Linder just after the legislature passed KELA, wherein they agreed to sell the tract for $25,000 per acre, or approximately $3,631,250. Treadwell and Linder assigned the option to Foxwoods Development Company, L.L.C. (Foxwoods) in 2007. Foxwoods sold the Gerlach tract option to Peninsula on July 15, 2010, for $5,300,000. Six days later, on July 16, 2010, Peninsula and Double Down Development entered into an option agreement with the owners of the Wyant tract for a purchase price of $8,000,000.

Peninsula Gaming was awarded the management contract on October 19, 2010. It exercised its option for the Wyant tract on March 2, 2011, and its option for the Gerlach tract the next day. The Wyant and Gerlach tracts together comprise the Subject Property.

C.    *Land value appraisal and appeal*

Kansas Star, a wholly-owned subsidiary of Peninsula and the gaming facility manager for the south central zone, was transferred ownership of the Subject Property and began operating the Kansas Star Casino there beginning December 26, 2011; as of January 1, 2012, the Subject Property consisted of an operating temporary casino and a partially constructed permanent casino. The Kansas Star Casino is situated on the southern Gerlach tract, while the northern Wyant tract is undeveloped aside from ingress and egress roads.

7

The County appraised the Subject Property at $91,000,000. Kansas Star appealed this appraisal to COTA. Following Kansas Star's appeal, the County hired Richard Jortberg as its litigation appraiser, who valued the Subject Property at $95,800,000. Kansas Star hired its own appraiser, Laird Goldsborough, who valued the Subject Property at $64,300,000. In deciding the appeal, COTA partially relied on Jortberg's appraisal and appraised the Subject Property at $80,510,000, including $16,931,250 in land value. Kansas Star now appeals COTA's land valuation of $16,931,250. The County cross-appeals, arguing COTA erred in declining to include various additional costs as part of its valuation of the Subject Property.

## DID COTA OVERVALUE THE SUBJECT PROPERTY?

Kansas Star argues COTA improperly valued the Subject Property because the land would never be worth $86,605 per acre without KELA and the management contract. Kansas Star essentially asserts that it paid an inflated price for the Subject Property due to the unique circumstances of the management contract and that without the management contract the Subject Property's value would be substantially less. Thus, according to Kansas Star, the value attributable to the management contract should be subtracted from the property value of the Subject Property for the purposes of ad valorem taxation.

This court reviews a decision from COTA in the manner prescribed by the Kansas Judicial Review Act, K.S.A. 77-601 *et seq*. This court may grant relief pursuant to K.S.A. 2014 Supp. 77-621, the pertinent portions of which provide:

> "(c) The court shall grant relief only if it determines any one or more of the following:
> . . . .

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

. . . .

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious."

In reviewing the evidence in light of the record as a whole, this court does not reweigh the evidence or engage in de novo review. The term "in light of the record as a whole" is statutorily defined to include the evidence both supporting and detracting from an agency's finding. K.S.A. 2014 Supp. 77-621(d). Thus, this court must determine whether the evidence supporting the agency's factual findings is substantial when considered in light of all the evidence. *Sierra Club v. Moser*, 298 Kan. 22, 62-63, 310 P.3d 360 (2013).

On appeal, "[t]he burden of proving the invalidity of agency action is on the party asserting invalidity." K.S.A. 2014 Supp. 77-621(a)(1); see *Milano's Inc. v. Kansas Dept. of Labor*, 296 Kan. 497, 500, 293 P.3d 707 (2013). Finally, when reviewing agency action pursuant to K.S.A. 2014 Supp. 77-621(c), this court takes into account the rule of harmless error. K.S.A. 2014 Supp. 77-621(e); *Sierra Club*, 298 Kan. at 47.

Kansas Star and the County agree that the cost approach was the appropriate method for valuing the Subject Property. The central tenet of the cost approach is the principle of substitution: an informed buyer will pay no more for a property than the cost to acquire a similar site and construct improvements of like desirability and utility. The Appraisal of Real Estate, Appraisal Institute, 379-80 (13th ed. 2008). An appraiser

9

estimates market value under the cost approach by (1) estimating the value of the land, (2) estimating the replacement cost of the improvements, (3) subtracting depreciation as necessary, and (4) adding the land and improvement values together. See *City of Wichita v. Eisenring*, 269 Kan. 767, 774, 7 P.3d 1248 (2000). With respect to COTA's cost approach analysis, Kansas Star challenges only the land value component of the analysis.

A.    *COTA Correctly Determined the Highest and Best Use of the Subject Property*

Under Kansas law, real property is appraised at its fair market value. K.S.A. 79-501. For the purposes of ad valorem taxation, the fair market value of a property is based on the property's "highest and best use." See *In re Equalization Appeal of Johnson County Appraiser*, 47 Kan. App. 2d 1074, 1091-92, 283 P.3d 823 (2012). The highest-and-best-use analysis is performed assuming the Subject Property is vacant. See *In re Tax Appeal of Yellow Freight System, Inc.*, 36 Kan. App. 2d 210, 218, 137 P.3d 1051, *rev. denied* 282 Kan. 790 (2006). Four criteria are used to evaluate a property's highest and best use: (1) physical possibility; (2) legal permissibility; (3) financial feasibility; and (4) maximum productivity. *Yellow Freight System, Inc.*, 36 Kan. App. 2d at 217. As the parties do not dispute that operating a casino on the Subject Property is physically possible, financially feasible, and maximally productive, the critical issue is whether it would have been legally permissible to operate a casino on the Subject Property assuming the property were vacant.

Kansas Star claims we must remove the value of the management contract from the land value and that such value must be determined as though the land were vacant and available only for purposes for other than a casino. We disagree. We assume operating a casino on the Subject Property would be legal if the land were vacant because on January 1, 2012 (the valuation date), Kansas Star held the management contract for the south central gaming zone, meaning under KELA it was the only entity legally capable of operating a casino on that date. As COTA accurately explained in its order, "[i]n a

10

highest and best use analysis, all actual market facts must stay the same, only the property at issue is assumed to be vacant." If all actual market value is presumed to be the same, then it must also be assumed no other entity is permitted to build another casino in the south central gaming zone. If this were not so, the market value of the surrounding agricultural land would fluctuate as other potential gaming facility managers enter into option contracts with the landowners in preparation for bidding for the management contract. Therefore, we agree with COTA's determination that the highest and best use of the Subject Property was operation as a casino because operating a casino was legally permissible for Kansas Star in addition to the other highest-and-best-use requirements.

With the highest and best use of the Subject Property established as a casino, COTA ultimately determined that the land value of the Subject Property was $16,931,250. Given the lack of comparable property due to the unique situation created by KELA and the one-and-only management contract, COTA determined the actual sales price for the Subject Property was substantial evidence and the best evidence of its fair market value. It arrived at the land value total by adding the $8,000,000 purchase price of the Wyant tract, the $5,300,000 price paid to Foxwoods to acquire its option on the Gerlach tract, and the $3,631,250 paid to the Gerlachs to acquire their property. The sum of these figures represents the price Kansas Star paid for the Subject Property in order to obtain a fee simple interest in the Subject Property and build and operate a casino on it. COTA's decision complies with Kansas law.

B.      *Kansas Star's Various Arguments Do Not Defeat COTA's Original Determination*

Kansas Star seeks to upend this relatively straight-forward analysis through various arguments. Specifically, Kansas Star asserts (1) COTA erred in failing to exclude value attributable to the management contract from the real property value of the Subject Property, (2) COTA improperly included the $5.3 million paid to Foxwoods to acquire the option to purchase the Gerlach tract, (3) COTA ignored that Kansas Star purchased

11

the Subject Property under undue compulsion, and (4) COTA erroneously determined that the Subject Property had no excess land. We will discuss each argument in turn.

1.    *COTA did not err in failing to exclude value attributable to the management contract from the real property value of the Subject Property*

Kansas Star explains that the $16,931,250 it paid for the Subject Property was not only for the land itself, but also for intangible interests apart from the land. According to Kansas Star, because the impact of the management contract on the sales price was not accounted for, COTA's land value does not comply with the Uniform Standards of Professional Appraisal Practice and is thus in violation of Kansas law. See K.S.A. 2014 Supp. 79-503a(k) ("The appraisal process utilized in the valuation of all real and tangible personal property for *ad valorem* tax purposes shall conform to generally accepted appraisal procedures."); K.S.A. 79-504; K.S.A. 2014 Supp. 79-505.

Essentially, Kansas Star asks us to classify the management contract as an intangible circumstance that artificially inflated the value of the Subject Property that Kansas Star willingly purchased. Kansas Star asserts that the management contract did not raise the literal value of the land because it did not alter the land outside of the framework established by KELA. For support Kansas Star cites *State ex rel. Stephan v. Martin*, 227 Kan. 456, 466, 608 P.2d 880 (1980), where our Supreme Court explained that "property tax is based on the value of the property itself, not on the income or economic condition of the property's owner."

Kansas Star's reliance on *Martin* is unpersuasive (and perhaps detrimental) because the management contract is *not* an "economic condition" that renders its alteration of the Subject Property's value irrelevant for the purposes of ad valorem taxation. In *Martin*, the Kansas Supreme Court struck down K.S.A. 1979 Supp. 79-342, a law that granted "a partial exemption from taxation to certain items of farm machinery

12

and equipment, according preferential tax treatment to some owners." 227 Kan. at 468. In doing so, our Supreme Court explained that "'the severe economic crisis' confronting individual farmers and ranchers [that prompted K.S.A. 1979 Supp. 79-342] confuses economic conditions affecting property owners with economic factors affecting the value of property," and as such K.S.A. 1979 Supp. 79-342 was unconstitutional under art. 11, § 1 of the Kansas Constitution. 227 Kan. at 466, 468.

In other words, *Martin* stands for the proposition that economic conditions, such as unforeseen or heavy expenses affecting a property owner, do *not* cause such owner's ad valorem taxation to change because such circumstances do not affect the value of the owner's real property. Conversely, an economic factor that *actually changes* the value of an owner's real property properly alters the owner's ad valorem taxation rate. Thus, Kansas Star's reliance on *Martin* is misplaced because the management contract creates precisely the hypothetical situation that would necessitate a change in an owner's ad valorem tax rate under *Martin*: a literal change in the value of the Subject Property.

The change in the Subject Property's value due to the management contract is evident because Kansas Star willingly and in the competitive free market paid $16,931,250, which is far more than market value of the surrounding tracts that were not eligible for casino development. The added value of the Subject Property, while undoubtedly caused by KELA and the management contract, does not represent value that is separate from the Subject Property's property value and exempt from ad valorem taxation.

> 2. *COTA did not err in including the $5.3 million option acquisition payment on the Gerlach tract as part of the value of the Subject Property*

Next, Kansas Star contends that the $5.3 million paid to Foxwoods to acquire the Gerlach tract purchase option should not have been included in COTA's valuation of the

13

Subject Property. Specifically, Kansas Star argues that the $5.3 million should have been excluded from the Subject Property's value because (1) the entire portion of the $5.3 million had not been paid to Foxwoods by the date of valuation and (2) purchasing Foxwood's option also served to remove Foxwoods as a potential gaming facility manager competitor, meaning the $5.3 million was consideration for more than just the value of the Gerlach tract option.

The County answers this argument by correctly pointing out that Kansas law requires the fee simple interest in a property be valued for the purposes of ad valorem taxation. *In re Equalization Appeal of Prieb Properties*, 47 Kan. App. 2d 122, 132, 275 P.3d 56 (2012). A fee simple interest is "'[a]bsolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.' [Citation omitted.]" 47 Kan. App. 2d at 130.

Thus, COTA properly recognized that in order for Kansas Star to acquire the requisite fee simple interest in the Gerlach tract, it had to pay $3,631,250 to purchase the tract itself and $5.3 million to acquire the option held by Foxwoods. Without buying the option, there would have been an encumbrance on the Gerlach tract, and Kansas Star would not have possessed a fee simple interest.

Kansas Star's arguments do not alter this conclusion. Although Kansas Star's obligation to pay Foxwoods $5.3 million had not fully matured at the time of the land valuation, this does not change the fact that Kansas Star and Foxwoods determined in an open and competitive market that Foxwood's property interest in the Gerlach tract was worth $5.3 million. As previously discussed, in this situation the price paid for the Subject Land was a proper proxy for determining the value of the land for ad valorem taxation.

14

Additionally, we are unpersuaded by Kansas Star's argument that the entire $5.3 million paid for the Gerlach option should not have been included in COTA's valuation of the Subject Property because the transaction simultaneously removed Foxwoods as a competitor as Kansas Star has not met its burden of proof. It is possible that Kansas Star paid an inflated price for Foxwood's option in order to rule out Foxwoods as a potential facility gaming manager, meaning the consideration paid for the option itself and the actual value of the Gerlach tract was lower than COTA's appraisal. However, as COTA accurately noted, "[n]othing in the option assignment documentation suggests the $5,300,000 was consideration for non-competition and nothing in the documentation prevented [] Foxwoods from presenting an alternative proposal to the State of Kansas at some other site." COTA also correctly explained that Kansas Star did not present documentation or evidence establishing what portion of the $5.3 million was attributable to noncompetition. It is Kansas Star's burden to prove COTA erred, and it has not done so with the evidence it provided. See K.S.A. 2014 Supp. 77-621(a)(1); *Milano's Inc.*, 296 Kan. at 500.

3. *COTA did not err in determining Kansas Star did not purchase the Subject Property under undue compulsion*

Kansas Star next argues that COTA erred in determining that no undue compulsion existed in the acquisition of the Subject Property. Elaborating, Kansas Star explains that once it had been awarded the management contract it had two choices: (1) sacrifice a lucrative management contract or (2) buy the Subject Property at an excessively high price. Kansas Star proceeds to analogize its purchase of the Subject Property to a distressed sale involving a seller in financial difficulty. Kansas Star cites no legal authority to support this argument.

In Kansas, "'[f]air market value' means the amount of money that a well-informed buyer is justified in paying and a well-informed seller is justified in accepting for

15

property in an open and competitive market, assuming that the parties are acting without *undue compulsion*." (Emphasis added.) *Sunflower Racing, Inc. v. Board of Wyandotte County Comm'rs*, 256 Kan. 426, 444, 885 P.2d 1233 (1994); see K.S.A. 2014 Supp. 79-503a. Kansas has not statutorily defined "compulsion," so we instead rely on the term's plain meaning. See *Moser v. Kansas Dept. of Revenue*, 289 Kan. 513, 516, 213 P.3d 1061 (2009).

COTA defined "compulsion" as follows:

"Black's Law Dictionary 305 (8th ed. 2004) defines 'compulsion' as '[t]he act of compelling; the state of being compelled,' '[a]n uncontrollable inclination to do something' or '[o]bjective necessity; duress.' Black's Law Dictionary 300 (8th ed. 2004) defines 'compel' as '[t]o cause or bring about by force, threats, or overwhelming pressure.' Black's Law Dictionary 542 (8th ed. 2004) defines 'duress' broadly as 'a threat of harm made to compel a person to do something against his or her will or judgment.'"

Kansas Star's argument entirely ignores that it entered into the options for the Subject Property voluntarily in an open and competitive market. There is no evidence in the record indicating Kansas Star was forced to pay a certain price for the Wyant and Gerlach tracts, nor is there any indication Kansas Star was somehow forced to exercise its options for the Wyant and Gerlach tracts after being awarded the management contract. We agree with COTA that Kansas Star was not acting under undue compulsion when it purchased the Subject Property.

4. *COTA did not err when it determined the Subject Property contained no excess land*

COTA determined the portion of the Subject Property that was formerly the Wyant tract was not excess land because (1) the tract contained ingress and egress roads that connected the Subject Property to U.S. Highway 81 and Kansas Highway 53, (2) the

16

evidence suggested the Wyant tract was necessary for drainage, (3) the Wyant tract was capable of development of casino-related amenities, and (4) Kansas Star paid $8 million for the Wyant tract, leading to the inference that the land was required for casino development.

Kansas Star takes issue with COTA's determination because the Wyant tract is not being used for casino development and, if Kansas Star desired, could be sold. Kansas Star minimizes the presence of the Wyant tract's ingress and egress roads by pointing out that the Gerlach tract has highway access to Highway 81 and the Kansas Turnpike. Further, the Wyant tract's drainage capabilities, according to Kansas Star, are irrelevant because there is little evidence in the record establishing whether the Wyant tract was necessary for the Gerlach tract's drainage. Finally, Kansas Star points out that 195 acres, the total area of the Subject Property, is not necessary for operation of a casino. Aside from citing a secondary source, Kansas Star again provides no legal support for its argument.

The County responds by citing the testimony of Kansas Star's expert, Goldsborough, who testified that the roads on the Wyant tract were used for ingress and egress, meaning there was evidence in the record that the Wyant tract was not excess land. It also cites evidence in the record that the Wyant tract is required for drainage. A reasonable person could agree that the Wyant tract serves the Gerlach tract in both capacities, meaning COTA possessed sufficient evidence for its determination. See *In re Protests of Oakhill Land Co.*, 46 Kan. App. 2d 1105, 1114, 269 P.3d 876 (2012).

Even if COTA erred in valuing the Wyant and Gerlach tracts together, this error would be harmless because the Wyant tract would have been valued at $8 million regardless of whether it was assessed simultaneously with the Gerlach tract. As previously discussed, the unique situation presented by KELA and the management contract meant that prices of surrounding land parcels were not an appropriate measure of land value; rather, the actual price paid for the Wyant tract was the proper measure of

17

land value in this situation. As the Wyant tract would have been properly valued at $8 million regardless of whether it was assessed together or separately from the Gerlach tract, we need not provide a remedy for the harmless error. See *Sierra Club*, 298 Kan. at 47.

DID COTA ERR IN RELYING ON JORTBURG'S APPRAISAL?

Kansas Star next asks this court to reverse COTA on the grounds that COTA erroneously relied on Jortburg's appraisal of the Subject Property. According to Kansas Star, COTA acted in error because Jortburg's land appraisal was unsupported by the record and did not conform to the Uniform Standards of Professional Appraisal Practice (2012-2013 ed.) (USPAP), meaning it should have been wholly disregarded. Specifically, Kansas Star asserts that Jortburg's appraiser violated USPAP Standards Rules 1-1, 1-4, and 2-1.

USPAP Standards Rule 1-1 requires appraisers to "employ those recognized methods and techniques that are necessary to produce a credible appraisal; . . . not commit a substantial error of omission or commission; . . . and not render appraisal services in a careless or negligent manner . . . that, although individually might not significantly affect the results of an appraisal, in the aggregate affects the credibility of those results." Standards Rule 1-4 requires appraisers to "collect, verify, and analyze all information necessary for credible assignment results." Finally, Standards Rule 2-1 requires that appraisers report their findings and assumptions clearly and accurately in a manner not misleading.

Because the USPAP Standards are embodied in the statutory scheme of valuation through K.S.A. 2014 Supp. 79-505 and K.S.A. 79-506, an erroneous determination that an appraisal adhered to USPAP would be considered an error of law. See *In re Protests of*

18

*City of Hutchinson/Dillon Stores for Taxes Paid in 2001 and 2002*, 42 Kan. App. 2d 881, 891-92, 221 P.3d 598 (2009).

In *Board of Saline County Comm'rs v. Jensen*, 32 Kan. App. 2d 730, 736, 88 P.3d 242, *rev. denied* 278 Kan. 843 (2004), this court held that the Board of Tax Appeals (renamed COTA at the time of this appeal) may not rely on an approach to value that is expressly prohibited by USPAP. However, USPAP violations that are not "materially detrimental" to an appraiser's overall opinion of value are not fatal to a county's case. See *In re Equalization Proceeding of Amoco Production Co.*, 33 Kan. App. 2d 329, 337, 102 P.3d 1176 (2004), *rev. denied* 279 Kan. 1006 (2005); *In re Equalization Appeal of Prieb Properties, L.L.C.*, No. 2004-3806-EQ, 2007 WL 5005139, at *5 (Kan. Bd. Tax. App. 2007).

Jortburg's alleged errors fall into two groups: (1) those COTA relied upon in valuing the Subject Property and (2) those COTA expressly rejected or ignored.

First, Kansas Star argues that Jortburg's appraisal did not comply with USPAP Standards 1-1 and 1-4 because his cost analysis failed to exclude land value that was actually attributable to the management contract. COTA specifically cited Jortburg's appraisal in determining the Subject Property was worth $16,931,259. However, as explained, COTA properly valued the Subject Property without reducing its value due to the management contract. Thus, Jortburg's conclusion—that the $16,931,259 Kansas Star paid for the Subject Property was for the land only and was not consideration for the management contract—was not a violation of USPAP because his conclusion was adequately explained and correct.

Second, Kansas Star complains of various errors in Jortburg's appraisal that were either expressly rejected or ignored by COTA. Kansas Star maintains that although these errors did not affect COTA's ultimate decision, they are errors nonetheless because they

are contrary to USPAP, therefore invalidating Jortburg's *entire* appraisal report and necessitating a remand.

COTA is not required to wholly reject an appraisal that contains non-USPAP compliant errors that are not materially detrimental. See *In re Amoco*, 33 Kan. App. 2d at 337. Rather, such errors in an appraisal go to the weight of the evidence, not the evidence's admissibility. *In re Prieb Properties*, 2007 WL 5005139, at *5. As COTA relied on portions of Jortburg's appraisal that were accurate and USPAP compliant to reach a well-reasoned and correct conclusion, we find Jortburg's appraisal was not materially flawed.

Even assuming Jortburg's appraisal was otherwise non-USPAP compliant in the manner claimed by Kansas Star, such deficiencies could not have harmed Kansas Star because COTA rejected or ignored those portions of Jortburg's appraisal. For instance, Kansas Star claims that Jortburg's appraisal erroneously included $9 million in off-site utilities, yet this conclusion was rejected by COTA and the $9 million was not included in COTA's ultimate valuation. Therefore, even if Jortburg's appraisal contained errors sufficient to invalidate it, we need not order a remand because COTA's error was harmless. See *Sierra Club*, 298 Kan. at 47.

DID COTA UNDERVALUE THE SUBJECT PROPERTY?

In its cross-appeal, the County argues COTA undervalued the Subject Property. The County asserts that COTA erred by (1) finding that the marquee sign was personal property that could not be included in its valuation, (2) failing to treat costs associated with the rental of KRGC trailers as soft or indirect costs in determining the replacement cost of the improvements, (3) failing to treat the additional $1.6 million in organizational costs as soft costs in determining the replacement cost of the improvements, and (4)

20

failing to treat the additional $3.1 million in financing costs as soft costs in determining the replacement cost of the improvements. We will assess each argument in order.

A.    *COTA correctly concluded Kansas Star's marquee sign was personal property*

The County contends COTA erred in determining the marquee sign was not real property subject to *ad valorem* taxation. For support, the County principally points to Jortburg's testimony that the marquee sign was attached firmly to the ground, would cause damage if removed, would be expensive to replace, adds value to the operation of the casino, and was integral to the casino facilities. It also relies on testimony from Cooper and Goldsborough that the sign would direct traffic to the facility, would require significant effort and funds to replace if removed, and was so big it could be seen from great distance.

Kansas Star counters with two arguments: first, it asserts that the Property Valuation Division (PVD) of the Kansas Department of Revenue, which promulgates rules and regulations binding on county appraisers pursuant to K.S.A. 79-1456, has stated that the following categories are personal property: "Sign-Business (attached to building)," "Sign (free standing)," and "Sign-Advertising (billboard)." It also claims that PVD has never categorized any form of commercial signage as real property. Accordingly, based on the PVD's classification of commercial signs, Kansas Star argues COTA properly determined that its marquee sign was personal property.

Second, Kansas Star makes the better argument that the County did not meet its burden of proof with respect to the classification of the marquee sign. We agree. The County bears the burden of proving the appropriate classification of the marquee sign as either personal or real property. See *In re Camp Timberlake, LLC*, No. 111,273, 2015 WL 249846, at *6-7 (Kan. App. 2015) (unpublished opinion). While the guidelines cited by Kansas Star above stress that the determination of whether property is real or personal

21

must be made on a case by case basis, the guidelines also state that an appraiser must be faced with a "unique situation or property" to deviate from the guide and use the three-pronged fixture test. That test under Kansas law for determining whether an asset is real or personal property was explained in *In re Equalization Appeals of Total Petroleum, Inc.*, 28 Kan. App. 2d 295, 299-300, 16 P.3d 981 (2000): "[T]he test for determining whether personal property becomes a fixture is: '(1) annexation to the realty; (2) adaptation to the use of that part of the realty with which it is attached; and (3) the intention of the party making the annexation.' [Citations omitted.]" After examining the record, we must agree with COTA that the County failed to provide sufficient evidence to carry its burden of proof on this point. Unlike in *Total Petroleum*, which contained numerous and detailed facts describing the construction of the fixtures at issue, here the County points only to testimony that is largely conclusory in nature. Therefore, we will not disturb COTA's finding that the marquee sign was personal property.

B.      *COTA correctly concluded the rental of trailers for the KRGC was not a soft cost*

Second, the County argues that the $20,000 cost associated with trailer rentals for the KRGC is a soft cost because Kansas Star, pursuant to the management contract, was required to accommodate KRGC employees during the construction process. In the context of real estate appraisal, "soft costs" or indirect costs are "[e]xpenditures or allowances for items other than labor and materials that are necessary for construction but are not typically part of the construction contract." The Appraisal of Real Estate, Appraisal Institute, 386 (13th ed. 2008).

Kansas Star responds that although it was obligated to accommodate KRGC employees through trailer rentals during the construction process, these employees were not necessary for the construction of the casino. For support, Kansas Star cites Cooper's testimony that the KRGC employees were not involved in any way with the construction. Although the KRGC employees' presence was necessary for licensing and approval of

22

vendors, this requirement related to the management contract, not the construction of the casino itself. As such, COTA was correct in determining that the $20,000 for the trailer rentals was not a soft cost subject to ad valorem taxation.

C.    *COTA correctly concluded the $1.6 million in organizational, administrative, and legal costs was not a soft cost*

Third, the County argues COTA erred in concluding that $1.6 million cost in organizational, administrative, and legal expenses was not included as soft costs for the Subject Property. For support, the County cites Jortburg's testimony that this cost "reflect[ed] the cost to the owner/developer to manage the development process" and "if those organizational fees weren't spent . . . you really wouldn't have completed a project."

Cooper, however, testified that the $1.6 million was for business start-up and preopening expenses, such as "regulatory fees, preopening payroll, preopening marketing, preopening training and the uniforms that our employees would wear once we opened up." He also testified that none of these expenses were construction-related. Based on Cooper's testimony, we agree with COTA that the $1.6 million was not a soft cost.

D.    *COTA correctly concluded that the financing costs were not soft costs*

Fourth, the County argues COTA erred when it concluded that financing costs totaling $3,186,685 were not soft costs. As previously explained, soft costs may include interim financing costs. But here, in determining the financing costs were not soft costs, COTA explained:

> "The County's evidence, however, for calculating the costs was flawed. The calculation did not address interest accruing only from the date of a draw and improperly assumed a

23

twelve month financing cycle. The County presented no evidence to support the assumption that a developer, or an owner in this market, would borrow funds to construct the casino. There is no other evidence to support an appropriate amount of interim financing costs. In light of the flaws, we find the County did not present sufficient evidence to support the inclusion of this additional soft cost."

The County explains that COTA lacked substantial evidence for its finding because Jortberg's calculations included $3,186,685 for financial costs. However, this argument confuses the County's burden of proof. COTA excluded the financing costs from the soft costs precisely because it *lacked* substantial evidence to make that finding. Specifically, the accuracy of Jortburg's projected financing costs was called into question because Jortburg based his calculations on 12 months of financing charges as opposed to the actual 9-month production cycle. This means his projected financing costs may have been artificially inflated, resulting in COTA's determination that the County failed to accurately calculate the financing costs. Due to these circumstances, the County's argument that COTA lacked substantial evidence to include the financing costs as a soft cost is without merit.

Affirmed.