NOT DESIGNATED FOR PUBLICATION

No. 115,587

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Equalization Appeal of
KANSAS STAR CASINO, L.L.C.
for the Year 2013 in Sumner County, Kansas.

MEMORANDUM OPINION

Appeal from Sumner District Court; R. SCOTT MCQUIN, judge. Opinion filed June 8, 2018. Affirmed in part, reversed in part, and remanded with directions.

*Jarrod C. Kieffer* and *Lynn D. Preheim*, of Stinson Leonard Street LLP, of Wichita, for appellant Kansas Star Casino, L.L.C.

*David R. Cooper* and *Andrew D. Holder*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, for appellee Sumner County.

Before POWELL, P.J., MCANANY, J., and HEBERT, S.J.

POWELL, J.:  Kansas Star Casino, L.L.C. (Kansas Star) appeals from the district court's ruling that established a 2013 valuation for ad valorem tax purposes of $152 million for its real property located in Sumner County, Kansas. Kansas Star argues the district court erred in two principal ways:  (1) The court's cost approach to value contained numerous errors; and (2) the court erred by rejecting Kansas Star's appraisal expert's income approach to value. For reasons more fully explained below, we agree that the district court erred in two respects which require a remand:  First, the district court erred by miscalculating the acreage of the real estate, meaning that its valuation could be in error as a result; and second, the district court erred by relying solely on the Deloitte and Touche audit of the sale of the Kansas Star Casino to calculate reproduction costs

1

because such audit figures were not intended to reflect actual reproduction costs. We affirm the district court in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

As this court explained in detail in *In re Equalization Appeal of Kansas Star Casino,* 52 Kan. App. 2d 50, 52-55, 362 P.3d 1109 (2015), *rev. denied* 307 Kan. ___ (December 20, 2017), Kansas Star is one of four state-sponsored gaming enterprises in Kansas and is located in the south central gaming zone. In April 2007 the Kansas Legislature enacted K.S.A. 74-8733 et seq., the Kansas Expanded Lottery Act (KELA) to authorize a limited number of casinos to be operated in Kansas. KELA divided the state into four gaming zones: northeast, south central, southwest, and southeast, with a single gaming facility allowed in each gaming zone. K.S.A. 2017 Supp. 74-8734(a), (d), and (h)(19). Sedgwick County and Sumner County comprise the south central gaming zone. K.S.A. 2017 Supp. 74-8702(f).

A.     *The Property*

Kansas Star is located in a rural area in the northeast corner of Sumner County (the County), near the southern border of Sedgwick County, just east of Highway 81 and immediately west of the Kansas Turnpike/Interstate Highway 35, the two primary highways that carry traffic between Sumner County and Wichita. The subject property consists of real estate, the casino, an arena events center, and other improvements and is largely surrounded by farm land.

The real estate consists of two formerly agricultural-use land tracts known as the Wyant and Gerlach tracts. The casino is situated on the southern Gerlach tract, while the northern Wyant tract is undeveloped aside from ingress and egress roads and permanent drainage easements. Kansas Star and the County both valued the real estate as one

2

economic unit for tax year 2013. The Gerlach tract is a 145.5-acre site purchased via an option contract for $3,631,250 ($25,000 per acre), plus $5.3 million to acquire the purchase option, for a total price of $8.9 million. Kansas Star exercised the purchase option on the 55.7-acre Wyant Tract for $8 million. After land platting and donations to various entities, the parties agree that the usable combined site is 195.5 acres.

The property was developed and constructed in phases. Kansas Star's initial proposal to the State called for the construction of a casino and an arena that would feature equine events and include approximately 600 horse stalls. While the permanent casino was under construction, Kansas Star operated a temporary casino in this arena, which opened its doors on December 26, 2011. Phase 1A was the construction of the arena with the temporary casino finishes. Phase 1B was the construction of the permanent casino, and phase 2 was the conversion of the arena from the temporary casino to the permanent arena. In December 2012, Kansas Star opened its permanent casino facility, which offers 1,825 electronic gaming machines, 45 table games, and 5 restaurants. As of the January 1, 2013 valuation date, phases 1A and 1B were complete—with the exception of the construction of a hotel—while phase 2 was ongoing. The hotel is owned and operated separately and is not included in the valuation.

At some point during the construction process, Kansas Star received permission from the Kansas Racing and Gaming Commission to change its plans for the arena. It received permission to downsize the number of horse stalls from 600 to 183, and it redirected the construction dollars to a conference and event center that was not proposed in the original gaming contract bid.

B.    *Board of Tax Appeal (BOTA) Proceedings*

The appraised value for tax year 2012 was $91 million. For tax year 2013, the County initially valued the subject property at $226 million, nearly double the $127

3

million acquisition and construction costs for the property. Della Rowley, the Sumner County Appraiser, testified that she came up with the $226 million value, but she did not consider herself qualified to appraise the casino property and she did not perform an actual appraisal. Rowley said the best information available to her for purposes of estimating fair market value was the project budget presented to the City of Mulvane and the County. Not surprisingly, Kansas Star disagreed with the County's proposed value and appealed to BOTA under K.S.A. 2012 Supp. 79-1609. (At the time Kansas Star appealed the County's tax valuation, the agency was known as the Court of Tax Appeals [COTA]. The agency name was changed to Board of Tax Appeals [BOTA] in 2014. L. 2014, ch. 141.)

After the property tax appeal was filed, the County hired Richard Jortberg, MAI, to appraise the property. Jortberg had been retained in 2000 by Gilpin County, Colorado, to value casinos within that county and has appraised approximately 30 to 40 casinos each valuation cycle for the past 12 years. Jortberg is also a licensed Kansas appraiser.

Jortberg performed an appraisal and concluded that the fair market value of the fee simple interest was $140 million. Jortberg considered all three approaches to value: the sales comparison approach, the cost approach, and the income approach. Jortberg found a lack of comparable sales to the property's unique status as the sole casino operation in the area. Jortberg used the income approach as a test of reasonableness for his cost approach analysis and concluded that because Kansas Star's business enterprise value far exceeded the value derived under this cost approach analysis, the cost approach was appropriate. Jortberg performed a highest and best use analysis and concluded that because it would be physically possible, legally permissible, financially feasible, and maximally productive to use the subject property for gaming/casino purposes, it was the property's highest and best use, both as vacant and improved.

Jortberg's cost approach consisted of land value and reproduction costs. For the land value, Jortberg used the $17 million purchase price for the Wyant and Gerlach tracts. However, because the property's actual gaming revenues were 10% higher than projected before the gaming management contract was awarded and before construction began, Jortberg also included a 10% upward adjustment to the purchase price—which he explained as being based on the property proving itself to be 10% more capable of being a successful casino operation than anticipated. Jortberg calculated a total land value of $18.7 million.

Jortberg testified that the property's land value was derived from KELA, the property's location as the closest property in Sumner County to Wichita, the property's accessibility from numerous highways, the property's visibility, its established utility extensions and infrastructure, and its functionality and developmental potential.

Jortberg had difficulty identifying comparable sales, but he ultimately compared the property to the sales prices in unexercised options for the nearby land tracts as well as the price paid for the land for Boot Hill Casino in Dodge City. Jortberg explained the sales prices were relevant because at the time they were agreed upon, KELA would have permitted gaming on those properties. Based on these comparisons, Jortberg concluded the price paid to acquire the property was the best evidence of value.

Jortberg did not include any deduction for functional obsolescence or external depreciation because the property was a new facility designed by experienced gaming operators. He pointed out that Boyd Gaming had purchased the property as part of its acquisition of Peninsula Gaming, the original owner of Kansas Star, and the audits conducted for Boyd Gaming reflected a value basis at cost or higher. With respect to depreciation and functional obsolescence, Jortberg analyzed both the arena and casino as a single unit without accounting for the mixed nature of the property. Jortberg acknowledged several methods of calculating depreciation and functional obsolescence,

5

but he did not analyze any potential superadequacy of construction. Similarly, Jortberg stated in his report that there was no economic obsolescence because "the enterprise value far exceeds the value of the real property." Jortberg further explained that he does not deduct functional or economic obsolescence unless the enterprise value is less than the reproduction or replacement cost.

Jortberg's appraisal also contained an "extraordinary assumption" as to the accuracy of the information he relied on in his appraisal because not all of the information desired was available from the property owner or its representatives. Jortberg wrote in his report:

> "There is one significant extraordinary assumption integrated in this valuation assignment. Not all information desired regarding the valuation of the subject property was available to the appraiser. It is an extraordinary assumption that the information presented in this report is accurate and that no material difference of any kind exists between that which has been included in the report. The extraordinary assumption is necessary since not all information desired was available from the property owner or its representatives. This is a particularly important assumption because of conflicting financial information presented in documents from Deloitte and Ernst and Young related to the subject property. The appraiser reserves the right to modify the value of the subject property if additional information is obtained."

Kansas Star disputes this, noting that it provided all of its construction cost information to the County. Moreover, Jortberg admitted that he did not review the letter provided by Kansas Star containing its construction costs "[b]ecause I had other documents that I had from the Taxpayer that I thought were—that I used."

James Vernor, a registered real estate appraiser and a witness called by Kansas Star, prepared a Uniform Standards of Professional Appraisal Practice (USPAP) review appraisal of the Jortberg appraisal report. Vernor's detailed report identified numerous

6

USPAP violations in Jortberg's report and concluded it was not USPAP compliant. He noted flaws in the land value analysis and a lack of recognized appraisal methodology in the depreciation and obsolescence determination. Vernor expressed concern with Jortberg's method of separating the intangible value from the real estate. Vernor believed that Jortberg should have included a hypothetical condition which could have accounted for how the passage of KELA and the casino management contract affected the value of the subject property. Vernor noted that KELA specified that the management contract not be considered property, but there was nothing in the report that acknowledged that Jortberg was aware of the provision in KELA, that he had read it, or that he tried to follow it. Vernor testified that he believed that Jortberg "missed the whole thrust of that KELA provision and that permeates the land value in his cost approach and . . . his treatment or lack of treatment of functional obsolescence in his cost approach." In addition, Vernor criticized Jortberg's classification of the management contract as zoning and the fact that there was not enough research as to whether the Wyant tract was considered excess land.

David Lennhoff, MAI, was retained by Kansas Star to appraise the property. Lennhoff is a nationally recognized expert in the area of separating real estate value from intangible value. Lennhoff performed a cost approach and a combined income/sales approach to the property. Kansas Star contends that the fair market value of the property is $62.1 million based on Lennhoff's appraisal.

Curtis Settle, a Colorado certified appraiser and a witness called by the County, performed a review appraisal of both Lennhoff's appraisal for Kansas Star and Jortberg's appraisal for the County. Settle found no internal inconsistencies with the Jortberg appraisal, but he did not give an independent valuation for the property. Settle concluded that Lennhoff's appraisal incorrectly reduced the value of the real estate by $49.2 million below the cost of construction "because the State of Kansas allowed construction of a casino on the property." Settle also noted that "even assuming that the Lennhoff

7

appraisal's hypothetical condition is correct, the resulting value conclusion lacks credibility because of the limited analysis and internal inconsistencies."

Before BOTA, the County, which had the burden of proof as to valuation, abandoned the $226 million valuation for the property and, instead, revised its position consistent with Jortberg's appraisal which asserted a value of $140 million. In closing arguments, the County's counsel asserted that that $140 million was an appropriate number but further suggested that an additional 15% for entrepreneurial profit might also be appropriate. Entrepreneurial profit is a market-derived figure showing the amount an entrepreneur expects to receive in addition to the construction costs. However, Jortberg's report specifically excluded any entrepreneurial incentive because owner/operator organizations generally develop casinos for their own specific use and their return was generally based on enterprise value created by the facilities.

BOTA rejected Jortberg's appraisal analysis for failing to apply recognized appraisal analyses to consider whether functional or economic obsolescence existed and, in fact, was not persuaded by either party's treatment of the obsolescence or depreciation issue under the cost approach. BOTA stated:

> "Jortberg failed to analyze any potential superadequacy of construction even though superadequacy was a potential issue given the KELA minimum investment requirement. Instead, Jortberg simply states that 'the appraiser notes no functional obsolescence.' County Ex. #522, p. 54. Jortberg stated in his report that no economic obsolescence existed because the business enterprise value far exceeds the value of the real property. Jortberg performed no recognized appraisal analysis to determine whether functional or economic obsolescence existed."

BOTA ultimately rejected the cost approach presented by both parties' experts and instead concluded that the best appraisal methodology was the income approach, estimating a value of the going concern—or business enterprise value—with a market-

8

derived allocation applied to arrive at an estimated market value. BOTA then modified Lennhoff's income approach by increasing his profit margin and allocation percentages to estimate a fair market value for the property of $105.6 million.

Both sides appealed and sought judicial review by a trial de novo in the district court.

C.    *District court proceedings*

Before the district court, no new evidence was presented, and the court considered the matter de novo based upon the BOTA record. The County abandoned all of its prior value determinations and instead picked out portions of the record from a variety of witnesses and exhibits to argue that the true value of the property was $154 million. Specifically, the County argued for a land value of $20 million, a reproduction cost of $113.3 million, and an entrepreneurial incentive of 15% as utilized in Lennhoff's appraisal. The County accounted for zero depreciation or obsolescence for the property—as suggested by Jortberg in his appraisal—for a total value of $154 million.

Because the County's own expert before BOTA had valued the property at less than the initial valuation of $226 million, Kansas Star moved for partial summary judgment on its tax liability and sought a refund of the amount of taxes it paid for value in excess of the $140 million value testified to by the County's expert. The district court denied the motion.

In an order dated January 6, 2016, the district court adopted the County's proposed findings of fact and conclusions of law, with the exception of using the $18.7 million land value contained in Jortberg's appraisal report. The district court also made one adjustment to the County's requested land value and concluded the value of the subject property was $152 million.

Kansas Star timely appeals the district court's order.

*Standard of Review*

Typically, we review BOTA's decision in the manner prescribed by K.S.A. 77-601 et seq., the Kansas Judicial Review Act (KJRA). K.S.A. 2017 Supp. 77-621(c) sets out eight standards under which a court is to grant relief. Although Kansas Star does not specifically reference the statute, its statement of issues suggests that it is relying on the following provisions of K.S.A. 2017 Supp. 77-621(c)(4) and (7):

"(4)     [T]he agency has erroneously interpreted or applied the law;

. . . .

"(7)     the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole."

K.S.A. 2017 Supp. 77-621(d) defines "in light of the record as a whole" to include the evidence both supporting and detracting from an agency's finding. Courts are typically required to determine whether the evidence supporting an agency's factual findings is substantial when considered in light of all the evidence. K.S.A. 2017 Supp. 77-621(d); *Redd v. Kansas Truck Center*, 291 Kan. 176, 183-84, 239 P.3d 66 (2010).

However, in 2014, the Legislature made changes to appeals from BOTA decisions which allow a taxpayer aggrieved by its decision to appeal to the district court and have the case tried de novo, meaning that any issues of law or fact are to be determined anew. K.S.A. 2017 Supp. 74-2426(c); K.S.A. 2017 Supp. 77-618(f). Kansas Star chose this route of appeal in this case. This means our standard of review is a traditional one similar to our review of any district court decision. See *Garvey Elevators, Inc. v. Kansas Human*

*Rights Comm'n*, 265 Kan. 484, 492, 961 P.2d 696 (1998) (traditional standard of review applicable to appeals from district court's de novo review of commission's record); *Reeves v. Equipment Service Industries, Inc.*, 245 Kan. 165, 169-70, 777 P.2d 765 (1989) (given district court's de novo review, appellate court not concerned with agency's decision but only district court's). But see *Pinnacle Point v. Board of Johnson County Comm'rs*, No. 115,026, 2016 WL 4518769, at *8 (Kan. App. 2016) (unpublished opinion) (district court's decision from BOTA order reviewed under KJRA). The parties appear to agree on this point.

While our review for legal errors is unlimited and requires no deference to either BOTA or the district court, our review of the district court's factual findings is different than how we would normally review BOTA's factual findings. See *Reeves*, 245 Kan. at 176 (appellate court may substitute its judgment on questions of law); *Williams v. Excel Corp.*, 12 Kan. App. 2d 662, 664, 756 P.2d 1104 (1988) (same). Whereas our review of BOTA's factual findings requires us to examine facts supporting and detracting from its findings, this is not so for a district court's factual findings. See *Reeves*, 245 Kan. at 176-77 (deferential standard of review of disputed issues of fact). When reviewing a district court's factual findings, our duty is to "view the evidence in the light most favorable to the prevailing party and determine whether there is substantial competent evidence to support the findings of the trial court." 12 Kan. App. 2d at 664; see *Reeves*, 245 Kan. at 176. Accordingly, instead of examining the record to determine if there is evidence contrary to the district court's findings, we simply review the record to determine if there is substantial competent evidence to support the district court's factual findings. *Reeves*, 245 Kan. at 170. "Substantial competent evidence is '"evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved."' [Citations omitted.]" *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 73, 350 P.3d 1071 (2015).

When reviewing whether a district court's decision is supported by substantial competent evidence, we do not reweigh the evidence, pass on the credibility of witnesses, or resolve conflicts of evidence. *In re Guardianship & Conservatorship of Burrell*, 52 Kan. App. 2d 410, 419, 367 P.3d 318 (2016). For a district court's decision to lack substantial competent evidence, it must be "so wide of the mark as to be outside the realm of fair debate." *In re Tax Appeal of Dillon Stores*, 42 Kan. App. 2d 881, 889, 221 P.3d 598 (2009). As such, "[f]indings that are supported by substantial evidence will be upheld by an appellate court even though evidence in the record would have supported contrary findings." *Chowning v. Cannon Valley Woodwork, Inc.*, 32 Kan. App. 2d 982, 987, 93 P.3d 1210 (2004). We also take into account the rule of harmless error. K.S.A. 2017 Supp. 77-621(e); *Sierra Club v. Moser*, 298 Kan. 22, 47, 310 P.3d 360 (2013).

When construing tax statutes, the statutes must be construed strictly in favor of the taxpayer. *In re Tax Appeal of Harbour Brothers Constr. Co*., 256 Kan. 216, 223, 883 P.2d 1194 (1994); *In re Tax Protest of Jones*, 52 Kan. App. 2d 393, 396, 367 P.3d 306 (2016), *rev. denied* 305 Kan. 1252 (2017). Interpretation of a statute is a question of law over which appellate courts have unlimited review. *Unruh v. Purina Mills*, 289 Kan. 1185, 1193, 221 P.3d 1130 (2009). When determining the validity of an assessment of the valuation of real property for uniformity and equality in the distribution of taxation burdens, the essential question is whether the standards prescribed in K.S.A. 79-503a have been considered and applied. *Krueger v. Board of Woodson County Comm'rs*, 31 Kan. App. 2d 698, 702-03, 71 P.3d 1167 (2003), *aff'd* 277 Kan. 486, 85 P.3d 686 (2004).

## DID THE DISTRICT COURT PROPERLY APPLY THE COST APPROACH IN COMPLIANCE WITH GENERALLY ACCEPTED APPRAISAL PRACTICES TO REACH THE FAIR MARKET VALUE FOR THE SUBJECT REAL ESTATE?

Kansas Star first argues that the cost approach adopted by the district court did not comply with generally accepted appraisal practices and that the value reached was not

supported by substantial competent evidence. Kansas Star complains that the district court merely adopted the County's "contrived cost approach value proposal" and contends the approach lacks any support in the record. Specifically, Kansas Star notes that none of the witnesses testified that the appropriate value for the subject property was $152 million. The County asserts that the district court correctly adopted the cost approach in valuing the property.

All real and tangible personal property in Kansas is subject to taxation on a uniform and equal basis unless specifically exempted. Kan. Const. art. 11, § 1(a); K.S.A. 79-101. The Kansas Legislature has enacted a statutory scheme to ensure property is appraised for ad valorem tax purposes in a uniform and equal manner.

When determining ad valorem valuation, Kansas law requires valuation of the fee simple interest, which is defined as

> "'[a]bsolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.' The Appraisal of Real Estate, p. 114 (13th ed. 2008). Stated another way, '[o]wnership of the fee simple interest is equivalent to ownership of the complete bundle of sticks [property rights] that can be privately owned.' The Appraisal of Real Estate, p. 112. . . .
>
> "Kansas tax statutes do not use the term 'fee simple'; however, it is clear that the legislative intent underlying the statutory scheme of ad valorem taxation in our State has always been to appraise the property as if in fee simple, requiring property appraisal to use market rents instead of contract rents if the rates are not equal. K.S.A. 79-501 requires that each parcel of real property be appraised for taxation purposes to determine its fair market value. In turn, K.S.A. 2010 Supp. 79-503a defines 'fair market value' as 'the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting *for property* in an *open and competitive market*, assuming that the parties are acting without undue compulsion.' (Emphasis added.) It is

clear, therefore, that the fair market value statute values *property* rights, not *contract* rights." *In re Equalization Appeal of Prieb Properties*, 47 Kan. App. 2d 122, 130-31, 275 P.3d 56 (2012).

The concept that Kansas law requires valuation of the fee simple interest is consistent with K.S.A. 79-102, which states: "[T]he terms 'real property,' 'real estate,' and 'land,' when used in this act, except as otherwise specifically provided, shall include not only the land itself, but all buildings, fixtures, improvements, mines, minerals, quarries, mineral springs and wells, rights and privileges appertaining thereto." This definition requires that all rights and privileges in real property are to be valued. However, "[f]or purposes of ad valorem taxation, Kansas law requires the valuation of the fee simple estate and not the leased fee interest." 47 Kan. App. 2d 122, Syl. ¶ 6.

In determining the ad valorem valuation, Kansas law assumes a hypothetical sale as of January 1 of the applicable tax year. K.S.A. 2017 Supp. 79-503a. The hypothetical sale must include only the sticks in the bundle of rights and may not include intangible interests or enterprise value. See K.S.A. 79-102; *In re Tax Protest of Strayer*, 239 Kan. 136, 142-43, 716 P.2d 588 (1986) (intangible property interests not taxable for property tax purposes).

K.S.A. 79-1455 states: "Each year all taxable and exempt real and tangible personal property shall be appraised by the county appraiser at its fair market value as of January 1 in accordance with K.S.A. 79-503a." As such, the Kansas statutory scheme "is a surrogate for a real marketplace event; the statute requires the appraiser to pretend, in effect, that each piece of property is sold on January 1 of the year in which the appraisal is done in an arms length transaction." *Hixon v. Lario Enterprises, Inc.*, 19 Kan. App. 2d 643, 646-47, 875 P.2d 297 (1994), *aff'd as modified* 257 Kan. 377, 892 P.2d 507 (1995). This pretend transaction is often referred to as a hypothetical sale of the subject property. Key to determining a value for this hypothetical sale is fair market value. K.S.A. 2017

14

Supp. 79-503a defines fair market value and provides guidance on the factors used to determine fair market value.

"'Fair market value' means the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. In the determination of fair market value of any real property which is subject to any special assessment, such value shall not be determined by adding the present value of the special assessment to the sales price. For the purposes of this definition it will be assumed that consummation of a sale occurs as of January 1.

"Sales in and of themselves shall not be the sole criteria of fair market value but shall be used in connection with cost, income and other factors including but not by way of exclusion:

"(a) The proper classification of lands and improvements;

"(b) the size thereof;

"(c) the effect of location on value;

"(d) depreciation, including physical deterioration or functional, economic or social obsolescence;

"(e) cost of reproduction of improvements;

"(f) productivity taking into account all restrictions imposed by the state or federal government and local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families as authorized by section 42 of the federal internal revenue code of 1986, as amended;

"(g) earning capacity as indicated by lease price, by capitalization of net income or by absorption or sell-out period;

"(h) rental or reasonable rental values or rental values restricted by the state or federal government or local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended;

"(i) sale value on open market with due allowance to abnormal inflationary factors influencing such values;

"(j) restrictions or requirements imposed upon the use of real estate by the state or federal government or local governing bodies, including zoning and planning boards or commissions, and including, but not limited to, restrictions or requirements imposed upon the use of real estate rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended; and

"(k) comparison with values of other property of known or recognized value. The assessment-sales ratio study shall not be used as an appraisal for appraisal purposes."

This list of factors is nonexclusive.

A.    *USPAP Compliance*

"Each parcel of real property shall be appraised at its fair market value in money, the value thereof to be determined by the appraiser from actual view and inspection of the property." K.S.A. 79-501. "The appraisal process utilized in the valuation of all real and tangible personal property for ad valorem tax purposes shall conform to generally accepted appraisal procedures and standards which are consistent with the definition of fair market value unless otherwise specified by law." K.S.A. 2017 Supp. 79-503a.

"K.S.A. 79-505 and K.S.A. 79-506 require that appraisal practice be governed by [USPAP]. These standards are embodied in the statutory scheme of valuation, and a failure . . . to adhere to them may constitute a deviation from a prescribed procedure or an error of law. [Citations omitted.]" *In re Tax Appeal of Brocato*, 46 Kan. App. 2d 722, 727, 277 P.3d 1135 (2011). USPAP requires that an appraiser "be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal." USPAP, Standard 1-1(a).

B.    *Cost approach*

A cost approach tax appraisal consists of three basic elements:  (1) land value; (2) replacement or reproduction cost new; and (3) depreciation/obsolescence. The Appraisal of Real Estate, Appraisal Institute, 142, Appendix 1 (14th ed. 2013). "The central tenet of the cost approach is the principle of substitution:  an informed buyer will pay no more for a property than the cost to acquire a similar site and construct improvements of like desirability and utility. The Appraisal of Real Estate, Appraisal Institute, 379-80 (13th ed. 2008)." *In re Equalization Appeal of Kansas Star Casino*, 52 Kan. App. 2d at 57. The cost appraisal method is generally applied to land that is improved and "allows for consideration of reproduction cost or replacement cost minus depreciation" of any improvements. 5 Nichols on Eminent Domain § 20.01 (3d ed. 2017).

To estimate fair market value under the cost approach, the appraiser follows four steps:  (1) estimate the value of the land; (2) estimate the replacement cost of the improvements; (3) subtract depreciation as necessary; and (4) add the land and improvement values together. 52 Kan. App. 2d at 57.

Following the cost approach method, the district court concluded that the land value of the subject property was $18.7 million and the reproduction cost of the improvements was $133.1 million. The court found the subject property suffered from no depreciation. Accordingly, the district court's final fair market value was $152 million.

1.    *Piecemeal approach*

The only two witnesses who offered opinions of value in the record were Jortberg and Lennhoff. Jortberg appraised the subject property at about $140 million, and Lennhoff appraised the property at $62.1 million. The County departed from its expert witness' value of $140 million and came up with its own approach to valuation. The

17

County proposed a land value of $20.178 million (from Kansas Star's accounting reports), $113.3 million for reproduction costs (carrying value for buildings and improvements from Kansas Star's accounting reports), plus a 15% entrepreneurial incentive (from Lennhoff's appraisal), and no deduction for depreciation or obsolescence. The district court rejected using the land value from Kansas Star's accounting report and instead adopted Jortberg's land value but otherwise adopted the County's asserted value. The following table illustrates the cost approach value components from both experts, the County's position of value before the district court, and the district court's order:

|  | Lennhoff | Jortberg | County | District court |
|---|---|---|---|---|
| Land value | $2 million | $18.7 million | $20.178 million | $18.7 million |
| Replacement cost/ Reproduction cost | $111.295 million | $120.1 million | $113.321 million | $113.321 million |
| Entrepreneurial incentive | 15% | 0% | 15% | 15% |
| Depreciation/ Obsolescence | $53.515 million | $0 | $0 | $0 |
| Total value | $62.1 million | $140 million | $154 million | $152 million |

The County acknowledges that neither party advocated for a fair market value of $152 million but argues the district court was not required to choose the total value of one of the two competing appraisals.

Kansas Star counters that the highest appraised value was $140 million and asserts that the pick-and-choose value approach is not supported by any witness or testimony in the record. No witness testified that these "cherry-picked" values could be applied in this manner to reach a credible value conclusion, and the only person asserting such a position was the County's counsel as part of his argument before the district court.

Moreover, Kansas Star complains that the district court's method is not supported by the evidence because the act of "appraising is a holistic process." In investigating an appraisal problem, an appraiser should "understand the interrelationships among the

principles, forces, and factors that affect real property value in the specific market area."
The Appraisal of Real Estate, Appraisal Institute, 36 (14th ed. 2013). Kansas Star argues
that the components of an approach to value are interrelated and should not be
determined independently in the pick-and-choose manner adopted by the district court.
Kansas Star provides the following example:

> "[I]n an income approach, vacancy percentage will be variable based upon the rental rate.
> At a rental rate of $1,000 for a given apartment, the owner may expect vacancy of 20%.
> However, at a rental rate of $900, his vacancy may only be 5%. If one applies a rental
> rate of $1,000 and a mis-matched vacancy rate of 5% to this apartment, he will conclude
> to a value that is too high."

Kansas Star cites this example as illustrating the danger in picking values from
each appraisal without providing expert testimony to establish the proper relationships
between the data points. Kansas Star claims this principle applies when evaluating a
subject property under the cost approach and that appraisers must specifically be
conscious of the interrelationship between cost and depreciation. According to Kansas
Star, the value found for depreciation may be higher or lower depending on whether the
appraiser uses reproduction cost or replacement cost. Reproduction cost is the cost to
identically reproduce the property being appraised—using the same materials and
design—and with all of its "deficiencies, superadequacies, and obsolescence." The
Appraisal of Real Estate, Appraisal Institute, 570 (14th ed. 2013). In contrast,
replacement cost is the cost to construct a functionally equivalent substitute for the
building being appraised. "The use of replacement cost can eliminate the need to measure
some, but not all, forms of functional obsolescence such as superadequacies and poor
design." The Appraisal of Real Estate, Appraisal Institute, 570 (14th ed. 2013).

> "If reproduction cost or replacement cost is used inconsistently, double-counting of items
> of depreciation and other errors can be introduced into the analysis. The cost basis
> selected for a particular appraisal should be clearly identified in the report to avoid

19

misunderstanding and must be applied consistently throughout the cost approach to avoid errors in developing an opinion of value." The Appraisal of Real Estate, Appraisal Institute, 570 (14th ed. 2013).

In its factual findings, the district court identified its costs as reproduction costs but then referred to replacement costs in its analysis section. Jortberg used reproduction costs in his appraisal rather than replacement costs. He explained that replacement costs do not include any functional difference between one property and another, but reproduction costs are the costs to replace the facility exactly. Jortberg admitted that reproduction costs—unlike replacement costs—may capture functional obsolescence in the costs of the improvements, including superadequacy, and agreed that a minimum investment requirement could lead a person to build a superadequate facility with functional obsolescence; thus, analyzing functional obsolescence was important. Although replacement costs are generally less than reproduction costs, Jortberg concluded that because the construction contracts were formed during a recession, he believed it was highly unlikely the property could be replaced for the price that Kansas Star paid for it. Kansas Star identifies the district court's confusion between reproduction costs and replacement costs as error and asserts the district court's conclusion was based on statements of counsel rather than evidence in the record.

The County relies on the holding in *Dillon Stores* for its position that a district court does not have to adopt the expert's opinion, but it may rely on evidence presented to adjust the total value of the subject property. In *Dillon Stores*, a taxpayer argued for a property value within a range of $4.4 to $4.9 million. Although BOTA adopted the taxpayer's appraisal, it determined that the appraisal failed to adequately account for the value of the freezer/cooler space. Thus, even though the amount was not included in the appraisal report, BOTA made a $590,000 upward valuation adjustment to the fair market value. On appeal, a panel of this court affirmed BOTA's ruling even though the taxpayer had not advocated for the adjustment. The panel noted that BOTA's adjustment was

20

derived from information contained in the appraisal report so it was adequately supported by substantial competent evidence. 42 Kan. App. 2d at 888-89.

*Dillon Stores* supports the County's position that Kansas law does not require the district court to adopt either party's appraisal report in full. If there is support in the record for the district court's finding, a valuation of the subject property that differs from either appraisal expert may be upheld.

2.    *Land value*

Kansas Star argues that the district court's adoption of a land value amount of $18.7 million, which was based on Jortberg's appraisal report, is wrong. Kansas Star complains that Jortberg merely added the purchase price of the subject land assemblage (the Gerlach and Wyant tracts) to the payment made by Kansas Star to Foxwoods Development Company for the option to purchase the Gerlach tract, plus a 10% premium for gaming revenue in excess of projections.

Jortberg testified that the land value was derived from KELA, the property's location as the closest casino to Wichita, its accessibility from numerous highways, its visibility, its established utility extensions and infrastructure, and its functionality and development potential. Jortberg determined that the property contained no excess land because it was platted as a single unit and because selling any part of the land would constrain future expansion. He was aware that Kansas Star had considered using a portion of the land as an RV park for equine events or potential retail uses.

In reaching his conclusion as to the value of the land, Jortberg compared the property to the sales prices in unexercised options for the other potential nearby sites, as well as the price paid for the Boot Hill Casino in Dodge City. Jortberg explained that the sales prices for the other nearby properties were the most relevant because at the time

21

they were agreed upon, KELA would have permitted gaming on those properties. Based on these comparisons, Jortberg determined the price paid to acquire the property was the best evidence of its value. He also found that sales of vacant farm ground were not comparable because the subject property's highest and best use was not agricultural.

This court previously addressed the land value dispute in Kansas Star's 2012 property tax appeal and affirmed COTA's determination that land value of the property was about $17 million. 52 Kan. App. 2d at 58. The land value reached by the district court here is consistent with the value reached in *Kansas Star Casino*, 52 Kan. App. 2d at 59-62, and there is substantial competent evidence in the record supporting such a conclusion.

### 3. *Highest and best use*

In Kansas, the market value of a subject property is based on its highest and best use. *In re Equalization Appeal of Johnson County Appraiser*, 47 Kan. App. 1074, 1090-92, 283 P.3d 823 (2012). A property's highest and best use analysis is evaluated as though the property were vacant. The four factors used to evaluate highest and best use are: (1) physical possibility; (2) legal permissibility; (3) financial feasibility; and (4) maximum productivity. *Kansas Star Casino*, 52 Kan. App. 2d at 57.

Jortberg conducted a highest and best use analysis and concluded that, as vacant, it would be physically possible, legally permissible, financially feasible, and maximally productive to use the subject property for casino and gaming purposes. He concluded that the subject property's highest and best use as improved was as a casino.

Kansas Star initially argues that the district court's highest and best use analysis erroneously assumes that Kansas Star has the management contract in place. But this argument was previously addressed by this court in 52 Kan. App. 2d at 57-58, and we

affirmed COTA's conclusion that the subject property's highest and best use, as vacant, was a casino.

Kansas Star now tries to persuade us that the panel in *Kansas Star Casino* was wrong on two key points: (1) Kansas Star is not asserting that the property cannot be used for gaming purposes; and (2) in a fair market value determination of fee simple interest in real estate, the "actual market facts" are not always assumed to be the same.

Kansas Star asserts that *Kansas Star Casino* was incorrect because it should have assumed, for purposes of its highest and best use analysis, that the management contract was available but not yet awarded, rather than actually awarded to Kansas Star. But there is a difference in the analysis from 2012 to 2013. In tax year 2013, the district court did not assume that Kansas Star was in possession of the management contract for its highest and best use analysis. Rather, the district court ruled:

> "Although the Taxpayer's expert accurately points out that KELA would require any purchaser of the vacant property to obtain a management contract before operating a casino, the Court finds that this point does not alter its analysis. A 'highest and best use' analysis only requires the Court to assume the subject property is vacant; it does not require the Court to otherwise suspend reality. The proper analysis therefore [is] the Court to consider the facts much as they were just prior to the Taxpayer acquiring the property. In that circumstance, the property would still be properly zoned, state law allowing a gaming facility in the south central gaming zone—KELA—would still be state law, and no other casino would exist in the region. Consequently, the Court agrees that the County's proposed use for the property, vacant, is legally permissible. Because there is no dispute that agricultural uses would also be legally permissible, the Court finds the Taxpayer's proposed use is also legally permissible."

Kansas Star also points to this court's holdings in *Amoco Production Co.*, 33 Kan. App. 2d 329, and *Prieb Properties*, 47 Kan. App. 2d 122, to support its position that when a taxing authority is assessing a property's fair market value, only the fee simple estate

23

should be valued. As an example, Kansas Star points to the effect a lease has on property. If a retail building is leased, then the full fee simple interest is not available for sale as it is subject to the lease. Thus, the only interest that could be sold is the leased fee estate. The problem with Kansas Star's argument is it erroneously equates the district court's highest and best use analysis with its determination of fair market value.

In *Prieb Properties*, the subject property was a single-tenant commercial building, subject to a 15-year build-to-suit lease to Best Buy. While COTA did not consider the actual lease in its assessment of fair market value, the issue in the case was the effect market rental rates had on the value of the property and what the proper market rental rates should be. There is nothing in the case to suggest that the appraisers, COTA, or our court disregarded the property's current use as a Best Buy store when assessing its highest and best use. 47 Kan. App. 2d at 125, 135-39.

In *Amoco Production Co.*, the highest and best use of a gas processing plant was found to be its current use because the plant was actively processing gas pursuant to processing contracts. The panel agreed with the Kansas Department of Revenue's expert appraiser who testified:

> "'Contracts on an existing gas processing plant amount to encumbrances. They could, they could add value or deduct from value. Therefore, you have to appraise a plant free and clear like an office building. Rents are important but you appraise the property free and clear because those leases may be favorable or disfavorable to the owner. A buyer is going to take that into consideration because they are going to have to live with that long-term. So far as I know ad valorem taxes valuation is based on market value fee simple interest. Like I said yesterday, anything less than fee simple interest is a partial interest . . . in the property, not 100%. That's why I didn't consider the fact that we didn't have those contracts that important.'" 33 Kan. App. 2d at 344.

In our view, neither case cited by Kansas Star supports its position that the district court should have disregarded the potential gaming use of the subject property when assessing its highest and best use. In response to Kansas Star's argument, the County explains that a management contract should not be analogized to a long-term lease and is irrelevant to the district court's highest and best use analysis. Supporting the County's argument is the Appraisal Institute's guidance to appraisers which mandates that appraisers apply the four highest and best factors to actual market data and to consider "[p]rivate restrictions, zoning, building codes, historical district controls, and environmental regulations" as part of the highest and best use analysis. The Appraisal of Real Estate, Appraisal Institute, 336, 338 (14th ed. 2013). Kansas Star attempts to clarify its position in its reply brief by stating that it is not asking the court to value the property as if it cannot be used for gaming purposes. Instead, Kansas Star argues the value of the property should reflect the amount that would be paid by a purchaser who could use the subject property as a casino but is not bound to operate a casino at the site. Despite this clarification, Kansas Star fails to show error with the district court's highest and best use analysis.

The district court acknowledged that the property was appraised at a higher value than a neighboring property, but it supported this higher value because KELA created the opportunity for the use of the property as a casino and the prices paid for the property were driven by the property's superior location, along with business motivations derived from KELA. While the management contract itself is not property, Kansas law recognizes the effect that an intangible asset may have on real property to the extent it enhances its value. See K.S.A. 2017 Supp. 74-8734(m); *In re Tax Appeal of Western Resources, Inc.*, 22 Kan. App. 2d 593, 602, 919 P.2d 1048, *rev. denied* 260 Kan. 993 (1996). Kansas law also recognizes other intangible considerations such as zoning and other use restrictions in valuing property. See K.S.A. 2017 Supp. 79-503a(j); *In re Equalization Appeal of Ottawa Housing Ass'n, L.P.*, 27 Kan. App. 2d 1008, 1013, 10 P.3d 777 (2000).

25

Fair market value is the amount of money that a well-informed buyer is justified in paying and a well-informed seller is justified in accepting for property in an open and competitive market. In this case, the value of the property was enhanced by its purpose as a casino. As such, the district court's highest and best use analysis is supported by substantial competent evidence.

4.     *Management contract*

Kansas Star next claims the district court's land value is erroneous because it includes value that is attributable, in part, to the management contract. Kansas Star argues the management contract is an economic condition that affects it alone.

Once again, this argument was previously rejected by this court for the tax year 2012 in *Kansas Star Casino*. In that appeal, Kansas Star relied on our Supreme Court's holding in *State ex rel. Stephan v. Martin*, 227 Kan. 456, 466, 608 P.2d 880 (1980), that "property tax is based on the value of the property itself, not on the income or economic condition of the property's owner." This court rejected Kansas Star's reliance on *Martin* in its 2012 appeal, specifically holding that "the management contract is *not* an 'economic condition' that renders its alteration of the Subject Property's value irrelevant for the purposes of ad valorem taxation." 52 Kan. App. 2d at 60.

Before us, Kansas Star now admits that under *Martin*, KELA is an economic condition affecting the value of real estate at large. Nevertheless, Kansas Star attempts to make a distinction between the management contract (an economic condition solely affecting an individual owner) and KELA (an economic factor affecting the market for real estate at large). Kansas Star maintains that even if KELA affected the Sumner County real estate market as a whole, Kansas Star purchased the land only because it was awarded the management contract.

The district court identified a fundamental flaw in Kansas Star's logic: Kansas Star paid nearly $17 million to acquire only the property rights to the Wyant and Gerlach tracts, and it agreed to that purchase price in advance of being awarded the contract. As such, it does not follow to suggest that Kansas Star paid approximately $17 million to the sellers in exchange for consideration—the management contract—even though the sellers did not own the contract and could not sell or award the contract to Kansas Star. The management contract was an asset that the sellers did not own and could not transfer or confer.

Kansas Star attacks the district court's conclusion, noting that distressed sales of real estate are routinely considered nonmarket transactions. For example, land transactions between adjoining landowners are often considered nonmarket sales because a person will tend to pay a higher price for land that is adjacent to land already owned. Kansas Star maintains that the fact that the management contract was not yet attached to the real estate does not guarantee that the transaction reflected fair market value. Kansas Star asserts that the fact that the price was agreed on prior to the management contract being awarded is irrelevant. If the sale is conditioned on a nonmarket event, then the nonmarket event likely influences the purchase price. Kansas Star maintains that the mere enactment of KELA was not sufficient to entice potential casino operators to purchase the subject property at a price of $84,000 per acre. Rather, potential casino operators were only willing to pay that price if they were awarded the management contract. Accordingly, Kansas Star maintains that the acquisition prices for the Wyant and Gerlach tracts do not reflect fair market value transactions of the fee simple interest.

As nothing has changed from the time of the 2012 tax appeal, we are unwilling to change our conclusion that the management contract was an economic condition affecting the value of the subject property.

5.      *Assemblage approach*

Kansas Star next claims that the district court's land value conclusion was based on an "assemblage" approach—merely adding together the purchase prices of various tracts assembled into a larger parcel—which is prohibited by Kansas law and USPAP. Kansas Star asserts that the district court's reliance on this approach is error as a matter of law.

USPAP Standard 1-4(e) provides:  "When analyzing the assemblage of the various estates or component parts of a property, an appraiser must analyze the effect on value, if any, of the assemblage. An appraiser must refrain from valuing the whole solely by adding together the individual values of the various estates or component parts." The comments to Standard 1-4(e) state:

> "Although the value of the whole may be equal to the sum of the separate estates or parts, it also may be greater or less than the sum of such estates or parts. Therefore, the value of the whole must be tested by reference to appropriate data and supported by an appropriate analysis of such data."

This USPAP provision was violated in *Dillon Stores*, where the appraiser used the assemblage approach to value but admitted that he failed to test his summation values. In analyzing Standard 1-4(e), the *Dillon Stores* panel stated:  "[A] summation approach *may* be acceptable as long as the value of the whole is tested and supported. According to the rule, however, an appraiser *must* analyze or test the effect on value of the assemblage of the various estates or component parts." 42 Kan. App. 2d at 890.

The parties here agree that USPAP prohibits an assemblage approach unless the value of the whole is tested and supported. The question is whether the market would pay the assemblage price of $17 million for the full 195.5-acre subject site as a single parcel.

28

Kansas Star claims the district court violated USPAP Standard 1-4(e) because its land value analysis was limited solely to determining the prices paid to acquire the Wyant and Gerlach tracts, adding those prices together, and then adding 10% to account for land value attributable to gaming revenues in excess of projections. But the County responds that this position is false, noting that Jortberg's appraisal report reflects that he considered many factors in determining the value of the subject property.

The County points out that Jortberg considered the sales of the Wyant and Gerlach tracts, as well as the unexecuted option agreements for two nearby tracts of land and the land sale for the Boot Hill Casino in Dodge City. Jortberg's appraisal included a matrix wherein he compared various aspects of the subject property as a whole (the combined Wyant and Gerlach tracts), such as size, location, and zoning. Jortberg also made an upward adjustment after combining the purchase prices of the Wyant and Gerlach tracts, noting that a 10% upward adjustment was necessary to account for the fact that as of January 1, 2013, the property had proven itself 10% more valuable than anticipated at the time of purchase. Kansas Star argues that Jortberg's approach did not reflect any attempt to "analyze or test the effect on value of the assemblage of the various estate or component parts." But without using those exact words, Jortberg's testimony reflects that is exactly what he did. Rather than relying solely on any type of assemblage approach, he made an upward adjustment to more accurately reflect the value of the subject property.

Notably, Kansas Star presented testimony from Vernor, who reviewed Jortberg's appraisal for USPAP compliance and concluded that while there were various deficiencies with Jortberg's appraisal, there was no violation of USPAP Standard 1-4(e). Given that there is nothing in the record that shows Jortberg's land value conclusion—which was relied on by the district court—was based on an assemblage approach that violated USPAP Standards, we conclude the district court did not impermissibly apply an assemblage approach.

29

6.      *Purchase price paid for the Wyant tract*

Kansas Star asserts that the $8 million paid to the owners of the Wyant tract was inflated because the owners were the last remaining land owners in the area and could hold out for a price above and beyond fair market value. The County does not dispute that Kansas Star paid more per acre to acquire the Wyant tract than it did to acquire the Gerlach tract or the unexecuted options for other nearby tracts. But Kansas Star acquired the purchase option for the Gerlach tract on July 15, 2010, just one day before it reached an agreement with the owners of the Wyant tract.

Kansas Star basically argues the district court could have viewed the $8 million purchase price for the Wyant tract as either evidence of fair market value or an inflated price due to the Wyant tract owners' status as a hold out. Kansas Star points to the following warning to appraisers:

"In many situations the conditions of sale significantly affect transaction prices. These atypically motivated sales are not considered arm's-length transactions. For example, a developer may pay more than market value for lots needed in a site assemblage because of the plottage value or enhanced development economies expected to result from the greater utility of the larger site." The Appraisal of Real Estate, Appraisal Institute, 410 (14th ed. 2013).

Additionally:

"Appraisers should also recognize that a buyer who purchases a site with the intent to assemble it with other parcels might have to pay a higher-than-market value for that site, particularly for properties acquired near the end of the assemblage period, sometimes called *holdouts* or *hold-out parcels*. Appraisers should avoid summing the costs of the component parts (i.e. the smaller parcels) to develop an opinion of the market value of the whole (i.e. the larger assembled parcel)." The Appraisal of Real Estate, Appraisal Institute, 364 (14th ed. 2013).

30

Although there is no dispute that appraisers should be cognizant of such factors, Kansas Star has not pointed to evidence in the record that the price of the tract was inflated because of a holdout. There is no evidence that the owners of the Wyant tract knew Kansas Star had acquired the option to the Gerlach tract the previous day or that the owners of the Wyant tract knew that Kansas Star also held the options on other nearby tracts. Any argument that the price of the Wyant tract was inflated because the owners knew they were in a position to hold out is mere speculation. Kansas Star has not met its burden of proof on this point.

Kansas Star bases its position on the proposition that the purchase price of the Gerlach tract was inflated. Kansas Star notes that the Wyant sales price was 250% higher than the per-acre price of any other comparable sale used by Jortberg and almost 1,400% higher than the Boot Hill sale price. Kansas Star claims the inflated sales price created a presumption that the sale should be analyzed for a "hold out" premium.

The district court chose to view the price as evidence of fair market value, and Kansas Star presents nothing beyond mere speculation that this was incorrect. The $8 million price as reflective of fair market value is supported by substantial competent evidence in the record. Even if Kansas Star could point to solid evidence that the $8 million price was due to the "hold out" status, there is also evidence in the record that it reflects fair market value.

7.    *Excess land*

Kansas Star next argues that 56 acres in the northeast portion of the Wyant tract is excess land, asserting that the land could be sold and is not necessary to the operation of the casino. The parties agree that the casino is operated solely on the portion of the property referred to as the Gerlach tract. Kansas Star claims the excess land must be evaluated separately for the highest and best use and contributory value.

31

In its decision, the district court noted that excess land is land that is not needed to serve or support the existing use, citing The Appraisal of Real Estate, Appraisal Institute, 200 (14th ed. 2013). But the district court disagreed with Kansas Star's position that the Wyant tract was excess land, stating:

"[T]he Court finds that the portion of the subject property formerly known as the Wyant tract is not excess land. Evidence put forth at the hearing reflects that the area contains access roads [and] drainage features necessary to the property. Moreover, the subject property was platted as a single property and, as evidenced by Jortberg's testimony, the Taxpayer has identified the potential uses such as an RV par[k] or other complimentary ventures which would enhance the value of the going concern and failed to manifest any intent to treat the property as excess land."

The district court's ruling follows this court's holding in the 2012 *Kansas Star Casino* appeal, where the panel stated:

"The County responds by citing the testimony of Kansas Star's expert . . . who testified that the roads on the Wyant tract were used for ingress and egress, meaning there was evidence in the record that the Wyant tract was not excess land. It also cites evidence in the record that the Wyant tract is required for drainage. A reasonable person could agree that the Wyant tract serves the Gerlach tract in both capacities, meaning COTA possessed sufficient evidence for its determination. [Citation omitted.]" 52 Kan. App. 2d at 64.

Kansas Star refers to the excess land as "[f]ifty-six acres of land in the northeastern portion of the Wyant tract" rather than referring to the Wyant tract as a whole. But the entirety of the Wyant tract is 55.7 acres. Lennhoff specifically identified the portion of the property he believed to be "excess" as the Wyant tract. It is apparent that Kansas Star's argument is the same previously raised in the prior appeal.

Kansas Star points to Jortberg's testimony that large casinos with arenas can be located on tracts less than 50 acres and that the Wyant tract is not necessary to support the existing casino. But when asked if the Wyant tract fit the definition of excess land, Jortberg testified that it is not excess land because it has the ability to be used for alternative uses which all enhance the property of the associated usage. Jortberg noted that the general manager of the casino told him that Kansas Star would not sell the property because it might hinder the value of the existing use. Jortberg unequivocally found that the land was needed to serve and support the existing use. Wendy Runde, the former assistant general manager at the Kansas Star Casino, also testified that the Wyant tract contains access roads and water containment features.

In its reply brief, Kansas Star notes that 63.5 acres of the casino site is currently being farmed, is not being used for gaming or commercial activities, and has been classified as agricultural use by BOTA. However, this information was included in the appendix to the reply brief and is not part of the record in this case. Including documents in the appendix of a brief does not make those documents part of the record that can be considered on appeal. *Romkes v. University of Kansas*, 49 Kan. App. 2d 871, 886, 317 P.3d 124 (2014). We will not look outside of the record to see how the land has been used since the appraisal in order to determine whether the district court's ruling was supported by substantial competent evidence as such decisions cannot be based on hindsight.

As evidenced by Jortberg's testimony, Kansas Star may be holding the usable portions of the Wyant tract for future development of ancillary facilities to the casino property. The district court's conclusion that the Wyant tract's access roads and drainage features serve the Gerlach tract and do not qualify as excess land is supported by substantial competent evidence.

8.    *Foxwoods payments*

Kansas Star argues that the district court erred by including the Foxwoods Development Company payment in determination of valuation.

Foxwoods, another casino company also competing for the casino management contract, held an option to purchase the Gerlach tract during the prior rounds of casino proposals. Kansas Star's parent company, Peninsula Gaming, acquired the option to buy the 145-acre Gerlach tract from Foxwoods for $5.3 million, to be paid over the course of several years. Jortberg testified that the $5.3 million paid to Foxwoods was part of the consideration paid to acquire the complete set of property rights for the property. Kansas Star argues that the district court erred by including the $5.3 million option price as part of its land value conclusion because some portion of that money may have been paid by Kansas Star to Foxwoods to eliminate Foxwoods as a competitor for the management contract.

Once again, this identical argument was raised and rejected in the prior 2012 tax appeal. This court held that regardless of the timing of the $5.3 million payment, "Kansas Star and Foxwoods determined in an open and competitive market that [Foxwoods'] property interest in the Gerlach tract was worth $5.3 million." *Kansas Star Casino*, 52 Kan. App. 2d at 61. Additionally, the court noted that COTA accurately found that nothing in the option assignment documentation suggested the $5.3 million was consideration for noncompetition and nothing in the documentation prevented Foxwoods from presenting an alternative proposal at some other location and that Kansas Star had not met its burden to show that COTA erred. 52 Kan. App. 2d at 62.

Kansas Star now argues the district court should have adjusted the payments to account for time value of money because the payments were to be made in the future. But no such testimony was found in the record. Jortberg testified that he made no such

34

adjustment because at the time the option agreement was entered into, no one knew when Kansas Star would make its payments to Foxwoods. Kansas Star has not pointed to any evidence from which the district court could find that such an adjustment was necessary or proper.

Here, as in its 2012 tax appeal, Kansas Star again fails to meet its burden of proof. While Kansas Star correctly notes that the County bore the burden of proof to establish the value of the subject property before BOTA, on appeal, it is Kansas Star, the party claiming error on the part of both BOTA and the district court, who has the burden to establish any error by the district court. More specifically, it is Kansas Star's burden to point to evidence in the record—not merely to cite outside sources—to show the error. There is no evidence supporting Kansas Star's position that the district court should have considered the time value of money and the timing of the payments, but there is ample evidence in the record to support the district court's finding that the $5.3 million option price was part of the value for Kansas Star's fee simple estate.

9. *Undue compulsion*

Kansas Star argues that the district court should have adjusted or rejected the purchase prices for the Wyant and Gerlach tracts because Kansas Star was contractually required to exercise its options on these tracts after being awarded the management contract. Once again, this argument is a repetition of the argument previously addressed and rejected by this court in *Kansas Star Casino*, 52 Kan. App. 2d at 63.

As noted, Kansas law defines fair market value as "the amount of money that a well-informed buyer is justified in paying and a well-informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion." *Sunflower Racing, Inc. v. Board of Wyandotte County Comm'rs*, 256 Kan. 426, 444, 885 P.2d 1233 (1994); see K.S.A. 2017 Supp. 79-503a. The

court noted that compulsion is not statutorily defined, so the term's plain meaning should guide the analysis. *Kansas Star Casino*, 52 Kan. App. 2d at 62-63. COTA relied on Black's Law Dictionary to determine the term's plain meaning and listed the following definitions for compulsion: (1) an uncontrollable inclination to do something; (2) objective necessity or duress; or (3) to cause or bring about by force, threats, or overwhelming pressure. 52 Kan. App. 2d at 63 (citing Black's Law Dictionary 300 [8th ed. 2004]).

After considering the definitions of compulsion, the previous *Kansas Star Casino* panel found no undue compulsion, noting that Kansas Star's argument ignored the fact that it entered into the options for the subject property voluntarily in an open and competitive market. It also found no evidence that Kansas Star was forced to pay a certain price or forced to exercise its options after being awarded the management contract. 52 Kan. App. 2d at 63. This argument has not changed, and Kansas Star points to no evidence in the record supporting its theory of undue compulsion.

10. *Reduction in acreage*

Kansas Star argues that the district court's analysis was erroneous as a matter of law because the acreage for the individual Wyant and Gerlach tracts totaled 201.2 acres, but the total usable acreage for the subject property was 195.5 acres. According to Kansas Star, the district court's failure to reduce the purchase price to account for the lost six acres is a glaring oversight in terms of proper appraisal practice, consistent with the district court's overall analysis.

Jortberg used the actual sale price of the 201.2 acre assemblage as the basis for the land value, with no adjustments. Kansas Star claims there should have been an adjustment for the six acres that were lost during the assemblage process, but there is no explanation by Kansas Star for what happened to those acres or why they were excluded

36

from the final subject property. The County does not concede error, but it also does not dispute it.

Problematically, Kansas Star points to no evidence in the record suggesting that the district court should make such an adjustment beyond its conclusory assertion that the proper calculation should have been for 195.5 acres. Nevertheless, it appears that the 195.5 acres is correct. When miscalculations are mathematical in nature, remand is appropriate with instructions to recalculate the valuation. *In re Equalization Appeal of Tallgrass Prairie Holdings*, 50 Kan. App. 2d 635, 657, 333 P.3d 899 (2014). Under the circumstances here, remand is appropriate to recalculate the land value based upon the correct acreage.

C.      *Reproduction costs*

Kansas Star principally argues the district court made two mistakes in its reproduction cost analysis:  (1) It incorrectly used generally accepted accounting principles (GAAP) accounting figures as surrogates for actual construction costs despite the availability of actual construction costs; and (2) it added entrepreneurial incentive to reproduction costs of a special purpose property. The County defends the district court by pointing out that Kansas Star's argument as to reproduction costs merely amounts to a complaint that the district court should have weighed conflicting evidence differently.

The district court ruled that the total reproduction cost for the subject property was $133 million, derived from an initial reproduction cost of $113 million and then increased by 15% to account for entrepreneurial incentive.

Kansas Star complains that the only evidence was its initial construction costs, and the district court erred by passing off the "Buildings and Improvements" line item from the financial documents that contain a different figure as a proxy for construction costs.

37

Kansas Star argues that the figures relied on by the district court were capitalized costs for GAAP account purposes and were not equivalent to construction costs. Kansas Star notes that Lori Nelson, who is responsible for the oversight of Kansas Star's financials, testified the audited financial figures were not intended to reflect actual real estate construction costs. Additionally, Settle testified that appraisers should not rely on accounting value estimates because the rules and motivations are not the same.

Jortberg used reproduction costs in lieu of replacement costs. He explained that replacement costs do not include any functional difference between one property and another, whereas reproduction costs capture the cost to replace the facility exactly. Jortberg acknowledged that replacement costs were generally lower than reproduction costs, but he testified that because the construction costs for this property were let during a recession, he believed it was highly unlikely this property could be replaced for the price that Kansas Star actually paid. Jortberg based his reproduction cost analysis on Kansas Star's costs as reported in an audit by Deloitte and Touche LLP. In Jortberg's report, he asserted the reproduction costs were $120 million, so the $113 million figure adopted by the district court was lower than Jortberg's figure.

The district court determined the best evidence of reproduction costs came from the Deloitte and Touche audit of the sale of the Kansas Star Casino from Peninsula Gaming to Boyd Gaming. The audit states that its estimate of building costs and improvements was derived using the cost approach using a direct cost model built of estimates of replacement cost. Kansas Star does not dispute that the audit estimated the value of its improvements to be $113 million, but it argues that a lower figure should have been adopted instead.

We agree with Kansas Star that the district court's conclusion on reproduction costs was not based on accurate evidence. While it is true that the figure adopted by the district court is lower than the $120 million figure testified to by the County's expert, the

$113 million figure is unsupported by substantial competent evidence in the record. There appears to be uncontroverted testimony in the record that the audited financial figures were not intended to reflect actual real estate construction costs or reproduction costs. In fact, neither appraiser relied on the figure in the audit in reaching an opinion on the reproduction cost value. Accordingly, except for the figures in the audit, the record lacks sufficient evidence supporting the district court's $113 million value for reproduction costs. As the evidence relied on by the district court was not intended to support an appraisal of reproduction costs, we must find reversible error on this point and remand the issue for reconsideration of reproduction costs.

D.     *Entrepreneurial incentive*

As part of its argument on reproduction costs, Kansas Star argues that the district erred including entrepreneurial incentive in the total valuation of the subject property.

Entrepreneurial incentive is "the amount an entrepreneur expects or wants to receive as compensation for providing coordination and expertise and assuming the risks associated with the development of a project." The Appraisal of Real Estate, Appraisal Institute, 573 (14th ed. 2013). In explaining the concept of entrepreneurial incentive, the Appraisal Institute has stated that "any building project will include an economic reward (above and beyond direct and indirect costs) sufficient to convince an entrepreneur to take on the risk associated with that project in the market." The Appraisal of Real Estate, Appraisal Institute, 573 (14th ed. 2013). When using the cost approach of appraisal, the Appraisal Institute references a need to estimate "the current cost to construct a reproduction of (or replacement for) the existing structure, including an entrepreneurial incentive or profit." The Appraisal of Real Estate, Appraisal Institute, 562 (14th ed. 2013).

After estimating the reproduction costs for this property, the district court made a 15% upward adjustment to account for entrepreneurial incentive. The district court determined it was appropriate to include an adjustment for entrepreneurial incentive because both experts agreed that entrepreneurial incentive should be considered. Although Jortberg did not include an adjustment for entrepreneurial incentive in calculating total value in his appraisal, he testified that such an adjustment could properly have been included. Lennhoff applied a 15% adjustment for entrepreneurial incentive, which the district court adopted. On appeal, Kansas Star argues that because the district court relied on reproduction costs rather than replacement costs, no entrepreneurial incentive should have been applied. Kansas Star claims the district court cherry-picked the "item from Lennhoff's report to bolster its already overstated reproduction cost."

Kansas Star also claims that an entrepreneurial incentive adjustment is not necessary with special purpose properties that are custom built by an owner-operator for his or her particular operation because such properties are not built by independent developers. Kansas Star gives the example of a refining company building a new refinery. The refining company does not expect a nonexistent developer to make a profit on its real estate investment but, instead, directly hires one or more contractors to build the refinery and generate its profit selling refined fuel and other products. Kansas Star claims the same is true of casinos.

Kansas Star also notes that Jortberg did not include entrepreneurial profit in his report "because owner/operator organizations generally develop casinos for their owner specific use. Their return is generally based on enterprise value created by the facilities." But Lennhoff also testified: "Doesn't matter if it's owner occupied or not owner occupied, what matters is if you're estimating market value[,] there has to be entrepreneurial incentive as a cost if you're estimating market value." Lennhoff further explained that the entrepreneurial incentive might get "wiped out as depreciation," but it had to be considered.

We have some concern that the district court did not consider how entrepreneurial incentive might be accounted for differently depending on whether an appraiser calculated reproduction cost or replacement cost. Lennhoff testified that consideration of entrepreneurial incentive was appropriate, but Lennhoff also considered entrepreneurial profit as part of replacement cost, not reproduction cost. In his report, Lennhoff explains that "distinguishing between replacement and reproduction cost is not as important as appropriately concluding functional and external obsolescence associated with removing the Subject's license agreement/management contract. (Both result in the same indicated value, once functional obsolescence-super adequacy is accounted for)."

While Kansas Star may have a valid concern with the district court's decision to choose values from different appraisers' reports, as some things may be accounted for differently when reaching a total value, it cannot point to definitive caselaw or testimony indicating that the district court erred in including entrepreneurial profit.

Once again, Kansas Star points to BOTA's decision in the 2015 appraisal of this property to support its argument. However, we cannot consider evidence outside of the record from the decision in 2015. See *Romkes*, 49 Kan. App. 2d at 886.

The district court's ruling adopting a 15% adjustment for entrepreneurial incentive is supported by Lennhoff's testimony and appraisal report, meaning there is substantial evidence in the record to support the finding.

E.    *Functional obsolescence*

Kansas Star also argues the district court erred by finding that the property does not suffer from functional obsolescence. Essentially, Kansas Star's position is that it was required to build the arena to satisfy its obligations in the management contract, but the arena is effectively worthless and brings down the value of the subject property.

41

Under the third step of the cost approach, an appraiser estimates the amount of depreciation, if any, for a property's improvements. Depreciation has three primary components: (1) physical deterioration; (2) functional obsolescence; and (3) external obsolescence. The Appraisal of Real Estate, Appraisal Institute, 614 (14th ed. 2013).

Functional obsolescence can take two forms: functional inadequacy and functional superadequacy. Functional inadequacy is a deficiency in the structure, materials, or design of an improvement, such as too few bathrooms in a residence or low warehouse ceiling heights. The Appraisal of Real Estate, Appraisal Institute, 623 (14th ed. 2013). Functional superadequacy is "some aspect of the subject property [that] exceeds market norms" or special features built to the owner's specifications that "would not appeal to the market in general," such as an expensive in-ground swimming pool in a low-cost neighborhood or a warehouse building with excess office space. The Appraisal of Real Estate, Appraisal Institute, 623 (14th ed. 2013).

The parties agree that the subject property does not suffer from any physical depreciation, but Kansas Star argues that functional obsolescence exists because half of the real estate contributes no net income or value and the arena loses millions of dollars every year. According to Wendy Runde, the former assistant manager of Kansas Star, the bid for the management contract required Kansas Star to build the arena, but the arena had never been profitable and she did not believe that Kansas Star would build an arena today. Kansas Star claims functional superadequacy is an issue because the casino building is larger than necessary to support the gaming market and the arena is a financial disaster that should never have been built.

Jortberg failed to perform a recognized appraisal analysis to consider whether functional or economic obsolescence existed, but there is evidence in the record supporting the district court's conclusions. Jortberg testified that he did not include any deduction for functional obsolescence or external depreciation because the property was a

42

new facility designed by experienced gaming operators. He pointed out that Boyd Gaming purchased the property as part of its acquisition of Peninsula Gaming, and both the Ernst and Young report and the Deloitte and Touche audit reflect a value basis at cost or higher.

In rejecting any adjustment for functional obsolescence, the district court focused on the following evidence:

- The facility was a new structure that incorporated best construction practices;
- The property was part of a real market transaction (the sale of Peninsula Gaming to Boyd Gaming) that reflected no evidence of functional or economic obsolescence;
- No impairment, obsolescence, or superadequacy was noted in the Deloitte audit;
- Although Kansas Star claims that KELA's $225 million investment threshold forced it to build superadequate components, Kansas Star spent an additional $35 million above and beyond the threshhold; and
- When Kansas Star decided to downsize its equine facilities, it did not elect to downsize any portion of the arena, despite now claiming it is functionally obsolete. The alteration resulted in additional conference space.

Kansas Star argues the evidence does not support the district court's findings and the court should have adopted Lennhoff's depreciation analysis.

First, Kansas Star claims the district court erred with its finding that Jortberg found no functional obsolescence because the facility was a new structure that incorporated best construction practices. Kansas Star cites *RAMA Operating Co. v. Barker*, 47 Kan. App. 2d 1020, 286 P.3d 1138 (2012), as support for its assertion that

43

Jortberg's opinion was merely a conclusory statement rather than evidence. In *RAMA Operating Co.*, the issue was whether an opponent to summary judgment could controvert statements of fact with conclusory denials. The conclusory denials were not supported with citation to the record. We reject *RAMA Operating*'s applicability because the evidence relied on by the district court appears in Jortberg's report and in his testimony. Moreover, there is nothing to suggest that Jortberg's opinions were conclusory as he visited the property and conducted a full appraisal of the property.

Second, Kansas Star argues that the use of best construction practices is irrelevant to superadequacy. The Appraisal Institute advises:

> "Functional obsolescence is caused by a flaw in the structure, materials, or design of an improvement when the improvement is compared with the highest and best use and the most cost-effective functional design requirements at the time of the appraisal. A building that was functionally adequate at the time of construction can become inadequate or less appealing as design standards, mechanical systems, and construction materials evolve."
> The Appraisal of Real Estate, Appraisal Institute, 623 (14th ed. 2013).

Kansas Star claims that special-purpose buildings routinely suffer functional obsolescence from superadequacy because they are tailored to the marketing themes or special needs of the owner-operator. Kansas Star argues the sale of Peninsula Gaming to Boyd Gaming does not establish that there was no functional or external obsolescence present. As an example, Kansas Star explains that if Walmart acquired Target, one could not conclude that Target's real estate in Topeka would not suffer from functional superadequacy. The County responds that the district court's reliance on this evidence was not wild speculation because the purchaser specifically allocated value to building components, so the district court's reliance on an actual market sale supports its conclusion that the property suffers from no functional obsolescence. We agree.

44

Third, Kansas Star argues the district court should not have relied on the Deloitte audit because the purpose of such an audit is not to consider obsolescence and superadequacy. Kansas Star claims the term "impairment" is not relevant to depreciation. The County asserts the audit is still relevant because it contains no evidence that the buyer made any adjustment to its estimate of value based on a belief that any component of the improvements did not contribute a value equal to the cost. Again, we agree; even if the Deloitte audit were not considered, it appears there is substantial evidence in the record supporting the district court's conclusion.

Fourth, Kansas Star argues that the district court improperly construed the evidence that Kansas Star reallocated a portion of its construction costs from equine-focused amenities to conference center space as evidence against functional obsolescence. Kansas Star claims this evidence supports its position because the reallocation came after Kansas Star realized the arena was a financial disaster and additional investment would only hinder its profitability. Kansas Star points to testimony from Runde, who said the arena was a losing venue and certainly was not a moneymaker. Runde described the Wichita market as saturated with arenas. Settle also pointed to the lack of bookings and profitability of the arena and admitted that it would not be reasonable to conclude there was no functional obsolescence under these circumstances.

Kansas Star's position is that Lennhoff's conclusion that the property suffered from functional obsolescence is more persuasive than the evidence supporting the district court's conclusion. Lennhoff testified that the casino was more profitable when it operated out of the temporary arena than when the permanent casino was opened, which points to possible superadequate construction. Lennhoff also testified that the arena was a poor idea.

But in using the market extraction technique applied by Lennhoff, the Appraisal Institute warns that "it is important to select sales that are subject to the same (or similar)

45

market influences," and the technique should be used only if sufficient data exists to adequately permit meaningful analysis. The Appraisal of Real Estate, Appraisal Institute, 605, 610 (14th ed. 2013). Lennhoff's market extraction analysis attempted to compare the casino portion of the subject property to the 2001 sale of a nongaming/service area of the former Sam's Town Casino in the Kansas City market. Lennhoff also relied on a sale from 2012 of the Pepsi Ice Midwest Arena, which he admitted had been sold after the arena was closed because of a system chiller failure. In rejecting Lennhoff's comparable sales and his market extraction analysis, the district court stated:

> "[T]he Court finds Lennhoff's reliance on the sale of the back-end of a closed, former casino in [a] wholly different and highly competitive market in Missouri, which sold twelve years prior to the date of valuation, is not a reliable or persuasive basis for determining the subject property has any functional or external obsolescence, much less that this property has depreciated $33,622,049. Likewise, the Court is unconvinced that the sale of an ice arena with a broken chiller system is factually relevant to determining any functional or external obsolescence of the arena improvements to this property."

Jortberg testified that the property did not contain superadequate components. The County's rebuttal expert, Settle, testified that if the arena had been valued in isolation—separate and apart from the casino—it would have obsolescence of some kind. But Settle also said that the entire project was very successful, so looking at it in the aggregate would be different than looking at the individual pieces and parts of the project. The district court found this testimony to be persuasive, explaining:

> "On this critical issue of functional obsolescence, or super adequacy as framed by the taxpayer, the court is persuaded that the county's evidence and argument is superior to that of the taxpayer. As the county states, the casino is new construction designed and built by experienced gaming facility operators. There should be no functional obsolescence. As to the claim of super adequacy, the taxpayer fails to account for the fact that this is property licensed for operation of a monopoly casino under [KELA]. The casino had to be of a certain size in order for the taxpayer to be awarded the management

contract. The arena was part of a total package presented to the state in order for Kanas Star to be awarded the management contract. Any purchaser buying the land for purposes of operating a casino under a KELA management contract would have to buy or construct similarly "super adequate" facilities to qualify for the management contract. Finally, as the county notes, when the property in question was purchased by Boyd Gaming there was no indication that any discount was given for any 'external factor . . . identified as a source of value loss.'"

The district court's conclusion that the property did not suffer from functional obsolescence is supported by substantial competent evidence. While we acknowledge compelling arguments on both sides of this question, and although Kansas Star has raised questions about some of the evidence relied on by the district court—and construed such evidence in support of its position rather than against—we are not allowed to reweigh conflicting evidence. "Findings that are supported by substantial evidence will be upheld . . . even though evidence in the record would have supported contrary findings." *Chowning*, 32 Kan. App. 2d at 987.

### DID THE DISTRICT COURT ERR IN REJECTING THE INCOME APPROACH?

Finally, Kansas Star reasserts its position that Lennhoff's income approach was more credible than Jortberg's cost appraisal. Lennhoff, Kansas Star's expert, performed an income approach with allocation to the real estate component.

The district court noted that this approach was sound in theory, but it found the income approach lacking in two ways: (1) Lennhoff used market profit margins and allocation percentages rather than property-specific figures from Kansas Star's business operation; and (2) the market information relied on by Lennhoff was skewed to reach a low value. Lennhoff applied an 18.8% profit margin because the use of competitive market profit margins was necessary to make a true comparison. The district court concluded:

47

"[T]he court is unconvinced that Lennhoff's percentage is appropriate in light of evidence from the County showing (1) a 24 percent profit margin from seven publicly traded gaming companies [Jortberg's appraisal report], and (2) that Kansas Star Casino's actual profit margin was 48 percent [Jortberg's appraisal report]. Lennoff's EBITDA multiplier, 7.25, is equally problematic because if falls well short of the mean EBITDA multiplier, 7.86, for the properties he reviewed. Finally, the Court questions the validity of Lennhoff's 25 percent value, which again was lower than the average of the properties he considered."

Kansas Star attempts to argue that because Lennhoff's income approach analysis was "the only correctly-performed and recognized appraisal analysis," the district court was required to adopt it. Not surprisingly, the County disputes Kansas Star's claim that its cost-approach analysis is non-USPAP compliant.

But even if a cost-approach analysis were not USPAP compliant, Kansas Star has cited no authority suggesting that if a district court were presented with two appraisal reports and found that one was non-USPAP compliant, then it must adopt the competing report. "USPAP violations that are not 'materially detrimental' to an appraiser's overall opinion of value are not fatal to a county's case. [Citation omitted.]" *Kansas Star Casino*, 52 Kan. App. 2d at 65. Kansas Star has not even attempted to show any USPAP violations that were materially detrimental to the district court's overall conclusion.

Kansas Star provides us with details about Lennhoff's income approach and claims it was the more appropriate approach to valuation of the subject property. Without reviewing the details, we see it as merely Kansas Star's attempt to ask us to reweigh the evidence. Again, our role is to determine whether the district court's decision is supported by substantial competent evidence, and, in doing so, we cannot reweigh the evidence, pass on the credibility of witnesses, or resolve conflicts of evidence. *In re Guardianship & Conservatorship of Burrell*, 52 Kan. App. 2d at 419. The district court found the County's cost approach analysis to be more credible. For a district court's decision to lack

substantial competent evidence, it must be "so wide of the mark as to be outside the realm of fair debate." *Dillon Stores*, 42 Kan. App. 2d at 889. There is substantial competent evidence supporting the district court's decision to reject Lennhoff's income approach to value.

Accordingly, we affirm in part, reverse in part, and remand with directions for the district court to recalculate the land value using the correct lower acreage figure and to reconsider the evidence in the record concerning reproduction costs.